Nos. 23-35322, 23-35323, 23-35324, 23-35354

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILD FISH CONSERVANCY,
*Plaintiff/Appellee/Cross-Appellant*,
v.

JENNIFER QUAN, in her official capacity as Regional Administrator of the National Marine Fisheries Service; JANET COIT, in her official capacity as the Assistant Administrator for Fisheries of the National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE; GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; UNITED STATES DEPARTMENT OF COMMERCE,
*Defendants/Appellants/Cross-Appellees,*
and

ALASKA TROLLERS ASSOCIATION and STATE OF ALASKA,
*Intervenor-Defendants/Appellants/Cross-Appellees.*

Appeal from the United States District Court for the Western District of Washington
No. C-20-417 (Hon. Richard A. Jones)

**FEDERAL DEFENDANTS-APPELLANTS'
FIRST CROSS-APPEAL BRIEF**

Of Counsel:

SHEILA LYNCH
*Attorney*
National Oceanic and Atmospheric
    Administration
Seattle, WA

MOLLY E. WATSON
*Attorney*
National Oceanic and Atmospheric
    Administration
Juneau, AK

TODD KIM
*Assistant Attorney General*

RACHEL HERON
REBECCA JAFFE
COBY HOWELL
FREDERICK H. TURNER
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES......................................................................................iii

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION .........................................................................2

STATEMENT OF THE ISSUE ................................................................................3

STATEMENT OF THE CASE .................................................................................3

      A.     Statutory background .............................................................................3

             1.     The Endangered Species Act .......................................................3

             2.     The National Environmental Policy Act.....................................4

             3.     The Magnuson-Stevens Fishery Conservation and
                    Management Act ..........................................................................5

      B.     Southern Resident killer whales and Chinook salmon................................6

      C.     The Pacific Salmon Treaty.....................................................................8

      D.     The 2019 Biological Opinion ...............................................................10

      E.     Proceedings below ..................................................................................13

SUMMARY OF ARGUMENT.................................................................................16

STANDARD OF REVIEW ......................................................................................19

ARGUMENT ...........................................................................................................20

I.     The district court's decision to vacate was an abuse of discretion. .....................20

      A.     The district court misapplied the relevant standards................................20

B.    The court erred in concluding the agency's errors were serious. ...............................................................................24

C.    The limited benefits and devastating consequences of vacatur weigh heavily in favor of remand without vacatur. ......................29

CONCLUSION ............................................................................................40

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE FOR BRIEFS

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) ........21

*Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146 (D.C. Cir. 1993) ................................... 23, 25

*Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ...........................23

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985)...............32

*Am. Water Works Ass'n v. EPA*, 40 F.3d 1266 (D.C. Cir. 1994) ............................... 24, 33

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934 (9th Cir. 2005) ..................................27

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,
618 F.3d 1066 (9th Cir. 2010) .......................................................................................19

*California Communities Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ......................................................... 23, 24, 30, 32

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018)...................................................................19

*City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334 (1933) ....................22

*Columbia Snake River Irrigators Ass'n v. Evans*, No. CV 03–1341–RE,
2004 WL 1240594 (D. Or. June 3, 2004) ........................................................................23

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) ..................................19

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ....................................................27

*Friends of Animals v. United States Fish & Wildlife Serv.*,
28 F.4th 19 (9th Cir. 2022) .............................................................................................38

*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
623 F. Supp. 2d 1015 (D. Ariz. 2009) ............................................................................23

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ...............................................................................19

*Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ............................................23

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995).........................................30

*In re Clean Water Act Rulemaking*, 60 F.4th 583 (9th Cir. 2023) .........................................20

*Inst. for Fisheries Res. v. U.S. Food & Drug Admin.*,
    499 F. Supp. 3d 657 (N.D. Cal. 2020) ...............................................23

*Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) ...........................19

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ...............................................33

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).............................................21, 24

*Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893 (9th Cir. 2020)............... 23, 25, 26, 27

*Nat'l Wildlife Fed. v. NMFS*, 839 F. Supp. 2d 1117 (D. Or. 2011) ...................................23

*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337 (9th Cir. 1995) ...........................................20, 22

*Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196 (D. Or. 2003)................................23

*Nat'l Wildlife Federation v. NMFS*, 886 F.3d 803 (9th Cir. 2015) ......................................35

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) ...............7

*Pac. Bell v. Pac. W. Telecomm. Inc.*, 325 F.3d 1114 (9th Cir. 2003).......................................23

*Pac. Coast Federation of Fishermen's Ass'ns v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008).................................................35

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) .................................25

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) ..............38

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) .........................................19

*United States v. Afshari*, 426 F.3d 1150 (9th Cir. 2005)........................................22

*United States v. Oakland Cannabis Buyers' Co-operative*, 532 U.S. 483 (2001) ......................35

*United States v. State of Wash.*, 459 F. Supp. 1020 (W.D. Wash. 1978) ..............................35

*United States v. State of Wash.*, 645 F.2d 749 (9th Cir. 1981) ................................35

*United States v. Texas*, 143 S. Ct. 1964 (2023) ........................................20, 21, 24

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .........................................21, 33

*WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855 (D. Mont. 2021) ..............................23

**Statutes**

Administrative Prodcedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.* .....................................2

   § 706 ......................................................................................20

Consolidated Appropriations Act, 2020,
   Pub. L. No. 116-93, 133 Stat. 2317 (2019) ......................................................34

Consolidated Appropriations Act, 2021,
   Pub. L. No. 116-260, 134 Stat. 1182 (2020) ....................................................34

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.* .............................................2

   § 1536(b)(4) .................................................................................4

   § 1532(16) ...............................................................................6, 7

   § 1532(19) ..........................................................................3, 4, 16

   § 1536(a)(2) ................................................................................3

   § 1536(o) ...........................................................................3, 4, 16

   § 1538(a)(1)(B) .....................................................................3, 4, 16

Judicial Procedure Act, 28 U.S.C. §§ 1291 *et seq.*

§ 1291 .................................................................................................2

§ 1331 .................................................................................................2

Magnuson-Stevens Fishery Conservation and Management Act,
16 U.S.C. § 1800 *et seq.*

§ 1802(11) ..........................................................................................5

§ 1811(a) ............................................................................................5

§ 1854 .................................................................................................5

§ 1855(d) ............................................................................................5

§ 1856(a)(3)(B) ...................................................................................6

National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* ......................2

§ 4332(2)(C) .......................................................................................5

## Rules

Federal Rule of Appellate Procedure 4(a)(1)(B) ...............................................3

## Regulations

40 C.F.R. Part 1500 (2019).................................................................5

§ 1501.4(b) .........................................................................................5

§ 1502.10 ............................................................................................5

§ 1508.11 ............................................................................................5

§ 1508.9 ..............................................................................................5

50 C.F.R. Pt. 402.................................................................................3

§ 402.14(a) .....................................................................................3, 4

§ 402.14(h) ........................................................................................................4

§ 402.14(i)(6) ..................................................................................................12

50 C.F.R. § 679.3(f) .......................................................................................10

70 Fed. Reg. 69,903-01 (Nov. 18, 2005) ..................................................6, 7

77 Fed. Reg. 75,570 (Dec. 21, 2012) ..........................................................10

88 Fed. Reg. 54,301 (Aug. 10, 2023) ...........................................................39

# INTRODUCTION

The Endangered Species Act ("ESA") protects threatened Chinook salmon and endangered Southern Resident killer whales. The salmon is prey for the whales, meaning that Alaska's management of the Chinook salmon fishery in state and federal waters—the latter of which is subject to federal delegation and oversight—may affect both species. The National Marine Fisheries Service ("NMFS") concluded in a 2019 biological opinion that the federal government's continued delegation of management authority to Alaska (and other related federal actions) complies with the ESA with regard to both species. Along with the opinion, NMFS included an incidental take statement that exempted incidental take of threatened salmon and endangered killer whales associated with the Chinook salmon commercial troll fishery from ESA liability, essentially enabling the fishery to operate consistently with the ESA.

The district court concluded that NMFS's biological opinion was lacking in certain respects, and NMFS is complying with the remand, which it expects to complete by the end of November 2024. This appeal presents the question whether the district court abused its discretion by vacating—as opposed to remanding without vacating—the relevant portion of the incidental take statement that applied to commercial trolling during the winter and summer fishing seasons. But for this Court's order staying the remedy order pending appeal, vacatur would have shuttered Alaska's commercial troll Chinook salmon fishery in the winter and summer seasons for as long as the remand proceeded, with devastating economic impacts and only small benefits to killer whales.

This Court should reverse the decision of the district court to vacate the incidental take statement not only because the court improperly applied a presumption of vacatur, but also because it abused its discretion by overestimating the impact of its chosen remedy on killer whales and underestimating the disastrous economic consequences for Alaska fishing communities.

## STATEMENT OF JURISDICTION

(a)    The district court had subject matter jurisdiction over this suit under 28 U.S.C. § 1331 because the claims of plaintiff Wild Fish Conservancy ("the Conservancy") arose under three federal statutes, namely, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*; the ESA, 16 U.S.C. §§ 1531, *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*

(b)    The district court's judgment was final because it resolved all the Conservancy's claims. 1 Excerpts of Record ("ER") 2–3. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)    The district court issued its remedy decision on May 2, 2023, 1-ER-4–5, and entered judgment on May 4, 2023. 1-ER-2–3. The Defendant/Intervenor State of Alaska noticed its appeal on May 3, 2023, and amended its notice on June 12, 2023. 8-ER-1899–1903. The Defendant/Intervenor Alaska Trollers Association noticed its appeal on May 5, 2023. 8-ER-1910–12. NMFS and the remaining federal defendants[1]

---

[1] Besides NMFS, the federal defendants are Jennifer Quan, in her official capacity as Regional Administrator of NMFS; Janet Coit, in her official capacity as the Assistant

noticed their appeal on May 23, 2023. 8-ER-1904–09. The Conservancy cross appealed on May 4, 2023. 8-ER-1913–16. The appeals are timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion when it vacated the portion of the 2019 biological opinion and incidental take statement that exempted from liability under the ESA, 16 U.S.C. §§ 1538(a)(1)(B), 1532(19), 1536(o), the incidental take of Southern Resident killer whales and Chinook salmon resulting from commercial harvests of Chinook salmon during the winter and summer seasons of the troll fishery in Alaska.

## STATEMENT OF THE CASE

### A.    Statutory background

### 1.    The Endangered Species Act

Section 7 of the ESA mandates that federal agencies must ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). To satisfy this substantive mandate, federal agencies must consult NMFS whenever the agency's action "may affect" a listed marine species. 50 C.F.R. § 402.14(a); *see* 16 U.S.C. § 1536(a)(2); *see generally* 50 C.F.R. Pt. 402. Where NMFS itself proposes to take an action that may affect listed species,

---

Administrator for Fisheries of NMFS; Gina M. Raimondo, in her official capacity as Secretary of the United States Department of Commerce; and the United States Department of Commerce.

NMFS is both the action and consulting agency. If the action under consultation is likely to adversely affect listed species, the agencies must engage in formal consultation, which culminates in the consulting agency issuing a biological opinion. *See* 50 C.F.R. §§ 402.14(a), 402.14(h). Among other things, a biological opinion includes the consulting agency's opinion on whether the proposed action is "likely to jeopardize the continued existence" of the species. *Id.* § 402.14(h).

ESA Section 9 separately prohibits the "take" of a listed species by any person. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). When a consulting agency determines that the federal action under consideration is not likely to jeopardize a listed species' existence but is reasonably certain to result in "take" of some individual members, the agency issues along with its biological opinion an "incidental take statement" that identifies the extent of anticipated incidental take, reasonable and prudent measures to minimize the extent of take, and terms and conditions to implement the reasonable and prudent measures. *Id.* § 1536(b)(4); *see generally* 50 C.F.R § 402.14(h). Incidental take in compliance with the incidental take statement is exempt from Section 9's prohibition on take. *Id.* § 1536(o).

### 2.   The National Environmental Policy Act

NEPA is a procedural statute that directs federal agencies to evaluate and disclose the environmental effects of, and alternatives to, proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C). An agency's analysis of environmental impacts is included in a document referred to as an "environmental impact statement" or "EIS." *See* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1508.11, 1502.10 (2019).[2] An agency may prepare a shorter document referred to as an "environmental assessment" (or "EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.4(b), 1508.9.

### 3. The Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act provides NMFS the authority to regulate fisheries in the United States' Exclusive Economic Zone, which extends from the seaward boundary of each coastal state to 200 nautical miles from the coastline and is also referred to as the federal waters. 16 U.S.C. §§ 1802(11), 1811(a), 1854, 1855(d). The Act empowers NMFS to review and implement fishery management plans, which are developed and recommended by Regional Fishery Management Councils. *Id.* § 1854(a). States can regulate fishing in the Exclusive Economic Zone when the fishery management plan delegates management to the State and when the State's regulations are consistent with that plan. *Id.*

---

[2] The Council on Environmental Quality ("CEQ") published a new rule in September 2020 revising earlier NEPA regulations, but NMFS's actions at issue here were subject to the earlier version of the regulations. Thus, all citations to CEQ regulations herein refer to the regulations codified at 40 C.F.R. Part 1500 (2019).

In addition, NEPA itself was recently amended by Section 321 of the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10, 38–46 (2023), but the amendments are not germane to this dispute. *Id.*

§ 1856(a)(3)(B). As relevant to this case, Alaska has been delegated authority by NMFS to regulate the commercial troll Chinook salmon fishery in the relevant Exclusive Economic Zone. 5-ER-884.

### B.    Southern Resident killer whales and Chinook salmon

Killer whales, also known as orcas, are long-lived marine mammals. They are top predators in the food chain and are the world's most widely distributed marine mammal, although they are most abundant in coastal habitats and high latitudes. *See* 70 Fed. Reg. 69,903-01, 69,904 (Nov. 18, 2005). They occur year-round in the waters of southeastern Alaska, British Columbia, and Washington, among other places. *Id.* at 69,905. In the eastern North Pacific region, killer whales have been classified into three different groups—residents, transients, and offshore whales—with different genetics, morphology, ecology, and behavior. *Id.* Resident whales occur in large, stable pods with membership ranging from 10 to 60 whales. *Id.* There are different groups of resident killer whales in the North Pacific—the Southern, Northern, Southern Alaska, Western Alaska, and Western North Pacific residents. *Id.*

At issue in this case is the Southern Resident killer whale. Southern Resident killer whales include three pods of whales. These pods spend a significant amount of time in inland waterways during the spring, summer, and fall, and move into offshore coastal waters in the winter months. 5-ER-966; 6-ER-1357.

Southern Resident killer whales were listed as an endangered "distinct population segment" subject to the ESA's protection in 2005. 16 U.S.C. § 1532(16); 70 Fed. Reg.

at 69,907–09; 5-ER-962–64. Distinct population segments are discrete and significant populations that are separated from other populations of the same taxon. 70 Fed. Reg. at 69,907–08; *see also Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1138 (9th Cir. 2007). Southern Resident killer whales face various threats, including threats to their habitat posed by contaminants, vessel traffic, sound, and limits on the quantity and quality of prey. 70 Fed. Reg. at 69,908–09; 5-ER-968–76. NMFS has developed conservation measures and research programs for Southern Resident killer whales to aid in their recovery. 70 Fed. Reg. at 69,909; *see also* 5-ER-972; 5-ER-975; 6-ER-1194–95. Southern Resident killer whale numbers increased between 1974 and 2011 to a total of 87, and experienced further population growth in 2014 and 2015; however, the population has since decreased to 74. 5-ER-962.

Chinook salmon serve as the primary food source for Southern Resident killer whales, though coho salmon contribute up to 40% of their diet in late summer months. 5-ER-968–69. Hatchery-produced salmon—i.e., salmon raised in a hatchery and then released to the wild—are a significant component of the prey available to the Southern Resident killer whales. 5-ER-968–69; 5-ER-972. While there is evidence that these whales can identify Chinook salmon, there is no evidence that they distinguish between wild and hatchery Chinook, both of which likely have the same caloric content and size when they return to their spawning grounds. *See* 5-ER-972.

NMFS has listed as threatened certain populations (known as "evolutionarily significant units") of Chinook salmon under the ESA, 16 U.S.C. § 1532(16). 5-ER-904–

05. Four of these evolutionarily significant units are relevant here: the Lower Columbia River, Upper Willamette River, Snake River fall-run, and Puget Sound. 4-ER-858; 5-ER-907–12; 5-ER-931–33; 5-ER-938–41; 5-ER-947–52; 5-ER-990. Each evolutionarily significant unit consists of both historical populations of salmon and salmon produced in specified hatchery programs. 5-ER-908–09; 5-ER-931; 5-ER-938–39; 5-ER-048–49. The recovery of these four evolutionarily significant units has been limited by numerous factors, including degraded habitat, hydropower facilities, poor water quality, fishing, and the release of hatchery-produced salmon (which can, at certain times and locations, pose a risk to wild fish from competition or breeding, which reduces genetic diversity and fitness). *See, e.g.,* 5-ER-926–30; 5-ER-935–38; 5-ER-946; 5-ER-957; 5-ER-1106–18; 6-ER-1168–88; 2-ER-276 ¶¶ 7-8; 4-ER-663–67; 2-ER-276–77 ¶¶ 7-8; 2-ER-102–03 ¶ 15; 4-ER-663-67.

Chinook salmon, including the listed salmon at issue in this lawsuit, spawn and rear in freshwater and migrate to the ocean, where they mature. 5-ER-890. They travel substantial distances. The primary populations at issue here spawn in the Pacific Northwest and migrate through Alaskan and Canadian waters. Most mature in 3-5 years and return to their spawning ground in 4-5 years. *Id.*; 5-ER-889; 5-ER-1132; 5-ER-1193; 2-ER-306 ¶ 12.

## C.    The Pacific Salmon Treaty

Because of migratory patterns, shown below, Chinook salmon that originate in the United States are often caught by fisheries in Canada, and vice versa. 5-ER-880; 5-

ER-890–92. Some Chinook salmon that originate off the coasts of Washington and Oregon migrate to Alaska and are harvested in Alaska's fisheries.



Figure 1. Migratory patterns of major Chinook salmon stock groups.

5-ER-890.

To help manage conflicts that arose from this dynamic, in 1985 the United States and Canada signed the Pacific Salmon Treaty, which established a management framework for Pacific salmon and set upper limits on Chinook salmon harvest. 5-ER-880–81; 4-ER-671–817 (Pacific Salmon Treaty, Jan. 28, 1985, T.I.A.S. No. 11091; Pacific Salmon Treaty Act of 1985, Pub. L. No. 99-5, 99 Stat. 7 (1985)). The United States and Canada most recently agreed upon an updated Chinook fishing regime in 2019 (the "2019 Agreement"), which set annual harvest limits for a ten-year period. 7-ER-1618–1701. The limits for Southeast Alaska fisheries were reduced by 7.5 percent in most years compared to the previous agreement made in 2009, which itself had reduced historic harvest limits. 5-ER-898; 7-ER-1618–1701.

Commercial and recreational fishing for Chinook salmon in federal waters in Southeast Alaska is governed by the fishery management plan for the salmon fisheries in the Exclusive Economic Zone off Alaska, which was developed and recommended by the North Pacific Fishery Management Council and approved by NMFS in 1979. 6-ER-1402; *see* 16 U.S.C. § 1852(a)(1)(G). The fishery management plan was comprehensively amended in 1990, in part to incorporate the limits from the 1985 treaty, and it delegated to Alaska management authority over sport and commercial troll fishing for salmon in federal waters off the coast of Southeast Alaska. 6-ER-1402; *see* 50 C.F.R. § 679.3(f). NMFS subsequently reaffirmed its delegation of such authority in an amendment to the fishery management plan, which is currently in effect for the fisheries that occur in federal waters off Southeast Alaska. *See* 77 Fed. Reg. 75,570 (Dec. 21, 2012). NMFS maintains oversight of Alaska's delegated management of the fisheries in federal waters off Southeast Alaska to ensure management is consistent with the fishery management plan. 7-ER-1462–66. The Alaska Department of Fish & Game sets the annual catch limits each year consistent with the 2019 Agreement. 7-ER-1428–30; 7-ER-1432–34. Between 2011 and 2019, Alaska estimates that, on average, 14% of the commercial Chinook salmon harvest occurred in federal waters. 7-ER-1615 ¶ 22.

## D.    The 2019 Biological Opinion

In 2019, NMFS issued a biological opinion that considered the combined effects of three federal actions on listed species including Southern Resident killer whales and four evolutionarily significant units of threatened Chinook salmon (Puget Sound

Chinook salmon, Upper Willamette River Chinook salmon, Lower Columbia River Chinook salmon, and Snake River Fall-run Chinook salmon). 5-ER-879–90. The three actions are: (1) the continued delegation of management authority to Alaska over salmon fisheries in federal waters off Southeast Alaska, 5-ER-884–85; (2) federal funding of Alaska's implementation of the Treaty, 5-ER-883–87; and (3) federal funding of a conservation program designed to benefit threatened Chinook salmon and killer whales, 5-ER-887–90; 5-ER-1105–19.

The conservation program had several components, including funding for habitat restoration projects for threatened Puget Sound Chinook salmon. 5-ER-888; 5-ER-1105–19. The component of the conservation program that is relevant here—the prey increase program—involves federal funding for hatchery Chinook production involving release of hatchery-raised salmon into the wild at strategic locations to serve as additional prey for the killer whale. 5-ER-888; 5-ER-1118–19 The prey increase program was projected to result in the release of millions of hatchery-raised young salmon per year to increase the availability of prey for killer whales. 5-ER-888–89. At the time the 2019 biological opinion issued, NMFS's analysis of this conservation program was considered "programmatic," meaning that the agency assessed impacts of the program at the framework (rather than implementation) level. *See* 5-ER-1105–19. NMFS planned to assess future, site-specific projects that actually received funding once the specifics of those projects became known, to determine whether the projects

11

were adequately covered by an existing biological opinion or would require additional consultation. 5-ER-888–89; 5-ER-1106–18; 6-ER-1167–1204.

The biological opinion concluded that the three actions under consideration were not likely to jeopardize the continued existence of either the threatened Chinook salmon populations or the Southern Resident killer whale. 6-ER-1204.

The biological opinion also included an incidental take statement that exempted take resulting from the Southeast Alaska fisheries. Given that the fisheries' primary effect on the killer whale is through possible reduction in prey availability, NMFS used the annual limit of Chinook salmon catch of the 2019 Agreement as a surrogate for measuring the incidental take of killer whales caused by the fisheries. NMFS exempted those fisheries only from the take associated with a reduction in prey available to the killer whales; no other type of take of killer whales was either anticipated or exempted. 6-ER-1205–06. Consistent with regulations, NMFS did not exempt take of threatened salmon populations associated with the prey increase program because the program was evaluated at a programmatic level. *See* 50 C.F.R. § 402.14(i)(6). NMFS instead explained that it would address any take associated with the prey increase program in site-specific consultations on individual projects. 6-ER-1206.

Under NEPA, NMFS did not analyze the effects of either the incidental take statement or the prey increase program at the programmatic level. NMFS has, however, since completed or identified applicable site-specific ESA consultations and NEPA analyses for the specific hatchery programs that have received federal funding since the

biological opinion issued in 2019. 2-ER-276 ¶ 5; 2-ER-297–99; 2-ER-100–01 ¶¶ 9–11; 2-ER-117–20; 4-ER-664 ¶ 15.

### E. Proceedings below

The Conservancy sued NMFS in March 2020 to challenge the biological opinion and incidental take statement, raising several claims under the APA, ESA, and NEPA. Alaska and a representative of the Alaskan commercial fishing industry (the Alaska Trollers Association) intervened as co-defendants. In September 2021, a magistrate judge issued a report and recommendation on the parties' cross-motions for summary judgment. 4-ER-614–55. The magistrate judge found that NMFS's no-jeopardy conclusion in the 2019 biological opinion was arbitrary and capricious—and that NMFS therefore violated its duty under Section 7 of the ESA to ensure that its actions are not likely to jeopardize listed species—because NMFS relied on the effects of mitigation measures that were uncertain to occur. 4-ER-638, 646–47.

Specifically, the magistrate judge found that NMFS erroneously relied on the anticipated offsetting effects of the prey increase program to conclude that the actions addressed in the biological opinion were not likely to jeopardize killer whales; the court perceived the prey increase program to be too vaguely described and uncertain to support a no-jeopardy finding. 4-ER-641–44. The magistrate judge also found that NMFS had improperly "segmented" its analysis by taking the prey mitigation program into account when considering the likely (beneficial) effects of agency action on the killer whales, without simultaneously considering the effects of that program on wild

Chinook salmon. 4-ER-644–46. The magistrate judge also held that NMFS violated NEPA because it should have analyzed the effects of both the issuance of the incidental take statement and the prey increase program. 4-ER-647–51. The district court adopted the report in full in August 2022 over the parties' objections. 4-ER-612–13.

Remedy proceedings followed. In December 2022, the magistrate judge issued a report and recommendation recommending partial vacatur of the incidental take statement contained in the biological opinion to remedy the ESA and NEPA violations that the court had identified at summary judgment. 1-ER-6–45. NMFS, Alaska, and the Alaska Trollers Association presented evidence to the magistrate judge demonstrating both that vacating the incidental take statement would cause devastating harm to the fishery and that the previously uncertain prey increase program had definitively materialized since 2019. *See, e.g.,* 3-ER-505–22; 2-ER-253–321; 2-ER-228–48; 2-ER-182–90; 1-ER-21–27 (discussing affidavits). Nevertheless, the magistrate recommended vacatur of those "portions of the [biological opinion] concerning the incidental take statement that authorizes 'take' of the Southern Resident Killer Whale and the Chinook salmon resulting from commercial harvests of Chinook salmon during the winter and summer seasons (excluding the spring season) of the troll fisheries." 1-ER-7.

Specifically, the magistrate judge believed that "circumstances in which a remand without vacatur is appropriate are 'rare' or 'limited'" because "the APA requires a 'presumption of vacatur' if an agency acts unlawfully and this presumption must be overcome by the party seeking remand without vacatur.'" 1-ER-18–19; 1-ER-29. The

magistrate further found that NMFS's ESA and NEPA errors were "sufficiently serious violations" that "undermine[d] central congressional objectives of the ESA and NEPA." 1-ER-31–33. The magistrate judge also focused on "potential environmental disruption, as opposed to economic disruption" that would result from its remedy decision, and believed that it should "tip the scale in favor of protecting listed species in considering vacatur." 1-ER-33–34 (internal quotations and citations omitted). The judge concluded that the economic losses that would result from vacatur of the incidental take statement "do not overcome the seriousness of NMFS's violations given the presumption of vacatur, the harm posed to the [killer whales] by leaving the incidental take statement in place and the Court's mandate to protect the endangered species." 1-ER-35.

The judge found, by contrast, that significant disruptive environmental consequences would result from vacatur or injunction of the prey increase program, and that therefore remand without vacatur of the portion of the biological opinion covering the prey increase program was appropriate. 1-ER-35–38. On May 2, 2023, the district court adopted the report in full over the parties' objections. 1-ER-4–5.

Alaska, the Alaska Trollers Association, the Conservancy, and NMFS each appealed. Alaska moved for a stay of the remedy order insofar as it vacated the portion of the incidental take statement exempting take by the commercial troll fishery. The Conservancy moved for an injunction pending appeal of the remedy order to the extent that the order did not vacate the portion of the biological opinion relating to the prey

increase program. On May 26, 2023, the district court denied the motions of Alaska and the Conservancy. 2-ER-66–70. Alaska moved for a stay pending appeal in this Court, which the Alaska Trollers Association and NMFS both supported. The Conservancy likewise moved this Court to enjoin implementation of the biological opinion as it pertained to the prey increase program.

This Court stayed the district court's judgment to the extent that it vacated the portions of the biological opinion and incidental take statement relating to the commercial harvests of Chinook salmon during the winter and summer seasons of the troll fishery. 2-ER-47–51. This Court found that "the moving parties have established a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Alaskan salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." 2-ER-50. This Court denied the Conservancy's motion to enjoin implementation of the prey increase program, "particularly in light of the district court's finding that" halting the program "would ultimately put the whales at further risk of extinction." 2-ER-51.

## SUMMARY OF ARGUMENT

The district court abused its discretion when it vacated the portions of the biological opinion and incidental take statement that exempted from liability under the ESA, 16 U.S.C. §§ 1538(a)(1)(B), 1532(19), 1536(o), the incidental take of Southern Resident killer whales and Chinook salmon resulting from commercial harvests of Chinook salmon during the winter and summer seasons of the troll fishery in Alaska.

16

Under this Court's precedent, vacatur of an agency action in response to a statutory violation is an equitable remedy that requires a court to consider the seriousness of the agency's errors and vacatur's disruptive consequences. A court should evaluate these factors neutrally. The district court here, however, erroneously presumed that vacatur is the appropriate remedy for the ESA and NEPA violations it identified. This presumption impermissibly placed a thumb on the scale of vacatur.

The court further erred by finding the errors made by NMFS to be serious enough to warrant vacatur when the record before the court showed the opposite. An error is sufficiently serious to warrant vacatur when the agency would not likely be able to reach the same result on remand via additional or different reasoning. Here, the district court found no fundamental flaws in the agency's analysis that would preclude it from adopting the same decision on remand with additional information. The court instead held that NMFS had not adequately considered the potential impacts of its decision on Southern Resident killer whales and ESA-listed salmon under the ESA and NEPA, and that there was inadequate information to establish that the prey increase program was certain enough to occur to qualify as mitigation. Since the district court's 2019 merits ruling, however, the prey increase program has been implemented and funded each year, as evidence submitted to the district court showed. NMFS has also analyzed the environmental impacts of each hatchery program that it funds (or ensured that existing environmental analysis is sufficient). This all shows that NMFS will be able to offer additional explanation and adopt the same decision on remand.

Finally, the district court abused its discretion when it weighed the disruption caused by vacatur against the incremental benefits. The disruptive consequences of vacatur would be extraordinary. The record before the district court demonstrated that vacatur would cause losses of $29 million each year in an industry that helps ensure the livelihoods of thousands of people. Vacatur would further disrupt the complex regulatory framework for managing fisheries, the balance struck by the United States and Canada in the Pacific Salmon Treaty, and the balance struck by Congress between Chinook salmon fisheries and killer whale preservation, in turn frustrating conservation efforts by pitting fishing communities against killer whale conservation.

On the other hand, any benefits to killer whales from vacating the incidental take statement would be small and short-lived. Fishing in *all* Southeast Alaska salmon fisheries during the remand period would reduce prey availability for killer whales by an average of only 0.5% in the coastal waters where whales are generally present during the winter and by an average of only 1.8% in inland waters where whales are generally present during the summer. The reductions in prey expected to result from only the winter and summer seasons of the commercial Chinook salmon troll fishery (which are only some of the salmon fisheries in Southeast Alaska) would necessarily be lower and would not, in NMFS's expert opinion, jeopardize the Southern Resident killer whale, particularly in light of the fact that the fish previously released as a result of the prey increase program are becoming available to supplement the prey for killer whales. NMFS expects to comply with the district court's remand order by the end of

November 2024. Taken together with the additional fish returning from prey increase funding, fishing during this period will not jeopardize the Southern Resident killer whale.

Meanwhile, the district court's order vacating the portion of the incidental take statement relating to the Chinook salmon troll fishery would irreparably devastate Southeast Alaskan communities. The district court abused its discretion by improperly discounting the effects of vacatur and overestimating any potential benefits to killer whales, and its order vacating the incidental take statement should be reversed.

## STANDARD OF REVIEW

A district court's remedy decision is subject to review for abuse of discretion. *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1082 (9th Cir. 2010); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654 (9th Cir. 2011). "District courts abuse their discretion when they rely on an erroneous legal standard or clearly erroneous finding of fact." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) (citation omitted). A remedy that is "overbroad" is an "abuse of discretion." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009)).

# ARGUMENT

## I. The district court's decision to vacate was an abuse of discretion.

The district court abused its discretion when it vacated the portion of the biological opinion and incidental take statement applicable to the winter and summer seasons of the Chinook commercial troll fishery in Southeast Alaska.

### A. The district court misapplied the relevant standards.

Instead of requiring the Conservancy to affirmatively demonstrate that vacatur of the incidental take statement was the appropriate remedy, the district court erroneously presumed that the incidental take statement should be vacated unless NMFS showed that vacatur was not warranted. *See, e.g.,* 1-ER-14, 29, 35. A court's decision to vacate an agency action is an equitable remedy.[3] *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593–94 (9th Cir. 2023) (describing vacatur as an exercise of equitable authority); *United States v. Texas*, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring) (describing vacatur as

---

[3] To the extent the courts have held that vacatur is the presumed remedy because Section 706 of the APA provides that "reviewing court[s] shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, it is the position of the United States that vacatur is not authorized by Section 706. *See United States* v. *Texas*, No. 22-58 (S. Ct.), Gov't Op. Br. 40–44; Gov't Reply Br. 16–20. Because it is not authorized by the statute, it cannot be considered a presumptive remedy for an APA violation. The federal government acknowledges, however, that this Circuit's precedent on APA remedies controls at this stage of the proceedings. *But see Texas*, 143 S. Ct. at 1980–85 (Gorsuch, J., concurring) (discussing whether vacatur is authorized by Section 706 of the APA and stating that the Supreme Court "would greatly benefit from the considered view of our lower court colleagues.").

an "expansive equitable power"); *cf. Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) (explaining that Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice"). Thus, vacatur should not be granted as a matter of course but only in accordance with the traditional balancing of equitable considerations. If anything, "faithful application of [equitable] principles suggests that an extraordinary remedy like vacatur would demand truly extraordinary circumstances to justify it." *Texas*, 143 S. Ct. at 1985.

While vacatur has sometimes been described by this Court as the presumptive remedy for an APA violation, *see, e.g., Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1121 (9th Cir. 2018); *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022), this presumption "invert[s] the proper mode of analysis," *Monsanto*, 561 U.S. at 157. Equitable remedies do not "issue[] as of course," but only where legal remedies are inadequate and "the intervention of a court of equity" is required to ensure against "irreparable injury." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). A party seeking equitable relief from a court must show entitlement to such relief. *Monsanto*, 561 U.S. at 156–57.

The Supreme Court's decision in *Monsanto*, which addressed the circumstances in which a court may issue an injunction, is instructive here. 561 U.S. at 156–57. The district court in *Monsanto* ordered that the appropriate remedy for the government's NEPA violation was, among other things, to enjoin the government from deregulating planting of genetically engineered alfalfa pending completion of the mandated

environmental impact statement and to enter a nationwide injunction prohibiting almost all future planting of genetically engineered alfalfa. *Id.* at 156. The petitioners argued that the lower courts had erroneously assumed that an "injunction is generally the appropriate remedy for a NEPA violation" that "may be withheld" only "in unusual circumstances." *Id.* at 157. The Supreme Court agreed, explaining that the "presum[ption] that an injunction is the proper remedy for a NEPA violation except in unusual circumstances" erroneously "invert[s] the proper mode of analysis." *Id.* A court should not "ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test" governing injunctions. *Id.* at 158 (emphasis in original). In other words, there should be no "thumb on the scales" in favor of equitable relief; the court should instead carefully consider each equitable factor to determine whether the party seeking relief has demonstrated entitlement. *Id.* at 156–57; *see also City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38 (1933) ("an injunction is not a remedy which issues as of course").

Despite language suggesting vacatur should be presumed, this Circuit has also held that courts are not mechanically "required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n*, 45 F.3d at 1343; *see also United States v. Afshari*, 426 F.3d 1150, 1156 (9th Cir. 2005) (explaining that it is "well established" that the APA does

not compel vacatur upon the finding of a legal violation or procedural flaw).[4] Rather, this Court should look to the two factors described in *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) to determine whether vacatur is appropriate. *See California Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). A court must first consider the seriousness of the agency's errors and, second, the disruptive consequences that would result from vacatur. *Id.* Courts may also consider the consequences to the environment, *National Family Farm Coalition v. U.S. EPA*, 966 F.3d 893, 929 (9th Cir. 2020), as well as the economic "disrupt[ion] to the [affected]

---

[4] Indeed, remand to agencies without vacatur is common. *See, e.g., Pac. Bell v. Pac. W. Telecomm. Inc.*, 325 F.3d 1114, 1123 (9th Cir. 2003) (allowing agency actions to remain in place pending completion of remand, even where the actions were found to be arbitrary and capricious); *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 883 (D. Mont. 2021) (stating in a biological opinion and incidental take statement challenge that the "underlying agency action may be 'left in place while the agency reconsiders or replaces the action'") (citing *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)); *Inst. for Fisheries Res. v. U.S. Food & Drug Admin.*, 499 F. Supp. 3d 657, 669 (N.D. Cal. 2020) (declining to vacate where the agency had not fully analyzed potential impacts but had taken precautionary steps, vacatur would result in wasteful loss of property and animal life, and the agency could cure defects on remand); *Nat'l Wildlife Fed. v. NMFS*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011) (holding that "equity can authorize the district court to keep an invalid [action] in place during any remand if it provides protection for listed species within the meaning of the ESA"); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (remanding without vacatur where vacatur would "disrupt settled transactions"); *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1041–43 (D. Ariz. 2009) (finding biological opinion arbitrary and remanding for reconsideration); *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196, 1215 (D. Or. 2003) (remanding biological opinion without vacatur, to give NMFS an opportunity to consult on identified defects); *Columbia Snake River Irrigators Ass'n v. Evans*, No. CV 03–1341–RE, 2004 WL 1240594, at *1 (D. Or. June 3, 2004) (expressly stating that the court "did not order the [biological opinion in *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196] vacated, but remanded it").

industries," *American Water Works Ass'n*, 40 F.3d at 1273. *See also California Communities*, 688 F.3d at 993–94 (considering environmental and economic consequences). That is, there is an equitable balancing of factors rather than application of a presumption.

Although the district court here acknowledged that it was required to balance the foregoing factors, the court nevertheless committed the same error identified in *Monsanto* by erroneously presuming that vacatur was the correct remedy, 1-ER-14, 29, 35, when, in fact, "[n]o such thumb on the scales is warranted," 561 U.S. at 157. The court instead should have neutrally considered whether the relevant equitable considerations favor vacatur, in light of the record compiled by the parties. This is particularly true when that relief substantially affects entities beyond the defendant federal agency, as is the situation here. *See Texas*, 143 S. Ct. at 1985–86 (Gorsuch, concurring) (cautioning that "a district court should 'think twice—and perhaps twice again—before granting'" sweeping relief in the form of vacatur) (citation omitted).

In sum, to the extent that the district court weighted the scale in favor of vacatur, rather than placing the burden of showing entitlement to vacatur on the Conservancy and neutrally considering the specific facts before it, that was error.

## B. The court erred in concluding the agency's errors were serious.

As discussed above, the district court's proper role under this Court's precedent was to weigh the factors set out in *Allied Signal*, the first of which is the seriousness of the agency's "deficiencies (and thus the extent of doubt whether the agency chose

correctly)." *Allied-Signal*, 988 F.2d at 150–51. To evaluate the seriousness of an agency's errors, courts consider "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Nat'l Fam. Farm Coalition*, 966 F.3d at 929 (quotations and citation omitted); *see Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (also relevant to the analysis is "whether by complying with procedural rules, [the agency] could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand."); *see also Allied-Signal*, 988 F.2d at 150–51. The district court abused its equitable discretion here: first, by automatically assuming that NMFS's errors were serious enough to warrant vacatur simply because killer whales are endangered and, second, by ignoring or giving unreasonably little weight to important facts in the judicial record. The record compels a finding that it is likely that NMFS will be able to issue the same incidental take statement on remand after additional explanation and therefore NMFS's errors were not serious. This factor did not favor vacatur, and the district court erred in concluding otherwise.

The court acknowledged that it was at least possible that NMFS would be able to reach the same result on remand. 1-ER-41. It nevertheless held that the legal errors it identified were serious because (1) the ESA requires the agency to ensure against the jeopardy of listed species, (2) the agency did not comply with the ESA or NEPA (and

therefore undermined statutory objectives), and (3) killer whales remain at a high risk of extinction. 1-ER-32–33. But not every legal error requires an agency's decision to be vacated; that is true even when the decision involves a listed species. When considering the seriousness of the errors, the district court should have considered only whether NMFS may adopt the same decision after conducting additional analysis. *See, e.g., Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (holding that an error under the Federal Insecticide, Fungicide, and Rodenticide Act—failing to consider harm to monarch butterflies caused by killing milkweed—was not serious where the agency was likely to be able to adopt the same outcome on remand).

The record compels a conclusion that NMFS is, in fact, likely to be able to adopt the same decision on remand. One of the district court's central reasons for finding an ESA violation was the perception that NMFS relied on the anticipated benefits of the prey increase program despite uncertainties about future funding and details of implementation. 1-ER-31 (citing 4-ER-640–47). NMFS had examined the prey increase program in the biological opinion at a framework level that enabled it to perform a broad-scale analysis of the program's benefits and impacts. *See, e.g.,* 5-ER-889; 6-ER-1304; 6-ER-1318–25. NMFS also committed to conducting additional, more detailed analysis under the ESA and NEPA as necessary and noted that it could always reinitiate consultation if there was inadequate funding and a corresponding need to develop additional mitigation for killer whales. *See, e.g.,* 5-ER-1106, 1114, 1119.

This level of detail and commitment to conduct additional studies did not satisfy the district court as to the merits. Significantly, however, the district court did not find that there was a fundamental flaw in the agency's ultimate determination that the Chinook salmon troll fishery in Alaska would not jeopardize listed species. The court concluded that the agency had not done *enough* analysis of the program's impacts under the ESA and NEPA or provided enough information to show that the mitigation program was certain enough to occur to satisfy the requirements of the ESA. *See* 1-ER-31–32; 4-ER-637–51. These kinds of errors are procedural in that they involve how much analysis NMFS completed (or when it was completed), as opposed to suggesting an incurable defect with NMFS's substantive conclusions on jeopardy. *See Nat'l Fam. Farm Coalition*, 966 F.3d at 929; *see also* 2-ER-275–76 ¶¶ 3–5 (discussing additional analysis). When an agency commits only technical or procedural errors, it generally is the case that the agency will "likely be able to offer better reasoning" and "adopt the same [decision] on remand." *Nat'l Fam. Farm Coalition*, 966 F.3d at 929 (quotations and citation omitted); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005).

The record eliminates any doubt that that is the case here. The court concluded that the details of the prey increase program were insufficiently concrete for the agency to rely on that program's benefits to offset any harm to the whale from harvesting salmon when the agency issued the biological opinion in 2019. However, the judicial record before the district court at the remedy phase in 2022 showed that in fact the prey

increase program has been funded (between $5.6 and 7.3 million annually) and implemented each year since 2020. *See* 1-ER-36; 2-ER-255–57 ¶¶ 7–9; 2-ER-305–07, 310–11 ¶¶ 11, 13, 22 ("[W]e anticipate increases in prey abundance are near to or being realized as we reach the 3–5 year maturation time frame following each year of implementation."); 2-ER-275–76 ¶¶ 3–5; 2-ER-284–85. Including fish from projects funded by Washington State, the combined federal and state releases are "on track to provide the benefits to [killer whales] that were anticipated in the [biological opinion]." 2-ER-275–76 ¶¶ 3–5; 2-ER-281–86; 5-ER-889 (anticipating funding from nonfederal sources); 4-ER-663 ¶ 13.

Even the district court noted that the "prey increase program—though previously uncertain and indefinite in the 2019 [biological opinion]—has also now been funded and begun providing prey the past three years." 1-ER-36. The subsequent implementation of the prey increase program as anticipated has effectively cured (or at a minimum, greatly reduced the significance of) any error on NMFS's part in relying on the then-tentative program to reach its no jeopardy determinations in the 2019 biological opinion.

Moreover, for every hatchery program receiving federal funding under the prey increase program, NMFS has subsequently completed site-specific ESA and NEPA analyses or identified existing ESA and NEPA analyses that evaluated the effects of increased hatchery production, including impacts to listed salmon. 2-ER-276 ¶ 5; 2-ER-100–01 ¶¶ 9–11; 2-ER-117–20; 4-ER-663 ¶ 15. Contrary to the district court's bare

conclusion that the agency's errors were serious, 1-ER-41, this analysis suggests that NMFS will be able to offer better reasoning on remand in support of its decision in the 2019 biological opinion to adopt the prey increase program at a framework level. The continued implementation of that program under the existing framework will in turn ensure that the agency can continue relying on that program's benefits to the whale's prey base when it considers the effect of continued salmon harvest in the future.

Yet, ignoring the new factual developments, the district court's discussion of the seriousness of the agency's errors parroted its earlier conclusion that the agency relied on "uncertain and indefinite mitigation measures." 1-ER-31. This was clearly erroneous, in light of the evidence that the prey increase program is in fact being implemented. Moreover, to the extent that the stakes of an agency's error under the ESA or NEPA may be high if a listed species is in greater peril, the district court additionally erred here by (as discussed further below, pp. 35–39) failing to consider whether the specific legal errors it found would exacerbate the killer whale's condition during the remand, given that the remand period was expected to be short and the prey increase program has been funded and operational for the past three years.

### C. The limited benefits and devastating consequences of vacatur weigh heavily in favor of remand without vacatur.

For the foregoing reasons, the district court erred in determining that the agency committed "serious" errors for purposes of determining a remedy. But in any event, even where an agency's errors are "significant," this Court has held that equitable

considerations may lead to remand without vacatur. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995). The district court abused its discretion in weighing the equities, just as it did in weighing the seriousness of the agency's error. Therefore, regardless of whether this Court finds that NMFS's errors were serious, it should reverse on the ground that the district court independently abused its discretion when it heavily discounted the disruptive consequences of vacatur while overstating the benefits to killer whales from vacatur. 1-ER-33–35.

At the outset, the district court erroneously believed that it was required to focus primarily on potential environmental, versus economic, impacts when weighing the equities. *See* 1-ER-33–34. Circuit precedent makes plain, however, that it is appropriate to consider economic impacts. *See California Communities*, 688 F.3d at 993–94. The district court also appears to have misunderstood the sweeping consequence of its decision, which would effectively close the winter and summer seasons of the commercial Chinook salmon troll fishery in Southeast Alaska. Although the district court correctly held that vacatur of the incidental take statement "in and of itself does not result in a prohibition on fishing," 1-ER-35 n.17, 2-ER-68–69, vacatur had the practical effect of operating as an injunction on the fisheries. Without exemption from ESA Section 9's prohibition on take in the incidental take statement, the State cannot open the fishery without risking severe civil and criminal penalties. *See* 2-ER-250; 2-ER-252; 4-ER-657.

The record before the district court demonstrated that vacatur would cause losses of $29 million each year in an industry that helps ensure the livelihoods of thousands of people. *See* 3-ER-516–22 ¶¶ 31–41; *see also* 2-ER-91–94 ¶¶ 34–40. Chinook salmon are the highest value per pound of the five salmon species harvested in Southeast Alaska, making them the most lucrative. 3-ER-514 ¶ 26. There are over one thousand active permit holders who participate in the troll fisheries annually, and many are small-scale participants who rely heavily on income from the troll fisheries. 2-ER-517 ¶ 32; *see also* 2-ER-90, 94 ¶¶ 32, 41. The troll fisheries support over 23 communities in Southeast Alaska, most of which are small, rural, and isolated, some of which are Alaska Native communities, and some of which depend heavily on the commercial troll fishery. 2-ER-517 ¶ 32; *see also* 2-ER-94 ¶ 41. If the incidental take statement is vacated, businesses may close, and jobs will be lost. 2-ER-230–32 ¶¶ 4–7.

The district court did not make factual findings concerning the extent of the potential economic impact, instead noting the parties' different estimates and acknowledging that vacatur would "result in disruptive economic consequences for the Chinook salmon troll fishery and the economy of Southeast Alaska," but nevertheless concluding that the economic impacts did not "overcome the seriousness of NMFS's violations given the presumption of vacatur, the harm posed to the [killer whale], and the Court's mandate to protect the endangered species." 1-ER-35. The Conservancy estimated an economic impact of the troll fishery around $9.5 million for the winter and summer seasons. *See* 1-ER-35 (citing 4-ER-603–04). This estimate, however, did

not account for economic impact beyond income. The data shows that the economic output of the commercial troll fishery in the winter and summer, inclusive of the wages, processing, and income from goods and services supporting fishing operations as well as ex-vessel value (that is, the dollar value of commercial landings), would be approximately $29 million every year. 2-ER-521 ¶ 40. The Conservancy also asserted that only 2.6% of the Southeast Alaska seafood industry would be impacted, but any number can be made to appear small by expanding the universe it is compared to. These economic impacts will affect thousands of individuals and devastate the many fishing communities that are dependent on the troll fleet. 2-ER-514, 517 ¶¶ 26, 32; 3-ER-516–22 ¶¶ 31–41; *see also* 2-ER-91–94 ¶¶ 34–40.

In short, individuals, businesses, and communities in Southeast Alaska will be irreparably harmed by vacatur of the incidental take statement. *See* 2-ER-517 ¶ 32; 2-ER-230–32 ¶¶ 4–7. This Court implicitly recognized as much when it held in granting the stay that "the moving parties have established a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Alaskan salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." 2-ER-50. Vacatur is inappropriate when it would cause "economically disastrous" impacts—as it will here. *California Communities*, 688 F.3d at 993–94 (rejecting vacatur because it would halt construction of a "much needed power plant" that employed 350 workers); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("[t]he threat of being driven out of

business is sufficient to establish irreparable harm."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (acknowledging that the potential closure of a business constitutes irreparable harm); *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1273 (D.C. Cir. 1994); *see also* 2-ER-140; 9th Cir. Dkt. No. 22-3 (pages 48–100 of attachments to 9th Cir. Alaska Congressional Delegation Amicus Brief). The severity of the economic impact here weighs heavily against vacatur, and the district court failed to give these grave harms sufficient weight, particularly considering the limited benefit that would accrue to killer whales from the closure of the fishery (discussed in detail below, pp. 35–39) and the likelihood that NMFS will be able to adopt the same approach on remand.

In addition to causing tangible economic harm to communities, vacatur will also disrupt the complex regulatory framework for managing fisheries, the balance struck by the United States and Canada in the Pacific Salmon Treaty, and the balance struck by Congress between Chinook salmon fisheries and killer whale preservation, all of which the district court failed to adequately account for. *See Weinberger*, 456 U.S. at 312 (courts "should pay particular regard for the public consequences" of equitable relief). The fishery limits set forth by the 2019 Agreement were "the result of a complex bilateral negotiation wherein the Parties sought to find an acceptable and effective distribution of harvest opportunities and fishery constraints that, when combined with domestic fishery management constraints, would be consistent with the fundamental conservation and sharing objectives of the Treaty." 5-ER-1053–54; 5-ER-879–83

(explaining history of treaty negotiation process and noting that, absent an agreement with Canada, NMFS was limited in its ability to consult on potential environmental impacts of salmon); 5-ER-887–88 ("Because of the complicated relationships between fisheries in Alaska, Canada, and the southern U.S. that are subject to the Agreement and the need to find a balanced solution, it was necessary to see that all fisheries were reduced."). The incidental take statement—and fishing that occurs pursuant to the take exemption included therein—is part of this comprehensive management scheme that is designed to achieve the objectives of the 1985 treaty and 2019 Agreement, including sharing limited fishery resources and conserving listed species. *See, e.g.,* 5-ER-81–83 (explaining history of NMFS's ESA consultation in relation to the treaty).

Congress has decided to fund the prey increase program against this regulatory backdrop, and with the understanding that commercial Chinook salmon fisheries coastwide will continue to operate under the rubric of the 2019 Agreement, taking into account the ESA status of killer whales and certain salmon populations. *See* 2-ER-255–57 ¶¶ 7–9) (discussing appropriations); *see, e.g.*, Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020); 4-ER-819–20 (Explanatory Statement Regarding the House Amendment to the Senate Amendment to H.R. 133, Consolidated Appropriations Act, 2021 at H7928). Although the district court believed that vacatur would achieve its "mandate to protect the endangered species," 1-ER-35, by vacating the incidental take statement, its decision instead circumvents the balance struck by

34

Congress. *See United States v. Oakland Cannabis Buyers' Co-operative*, 532 U.S. 483, 497 (2001) (courts should not deprive "Congress' 'order of priorities,' as expressed in the statute" of effect) (citation omitted); *cf. United States v. State of Wash.*, 459 F. Supp. 1020, 1106 (W.D. Wash. 1978), *aff'd*, 645 F.2d 749 (9th Cir. 1981) (the public interest is served "by permitting the United States Government to honor its treaty obligations").

In addition to inappropriately discounting the severe social, political, and economic consequences that would result from vacatur, the district court further abused its discretion by overestimating the benefits. To obtain equitable relief in an ESA case, a plaintiff must generally demonstrate "a definitive threat of future harm" to the species absent that remedy. *Nat'l Wildlife Federation v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2015) (citation omitted); *cf. Pac. Coast Federation of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008) (the issuance of an injunction based on harm to individuals of a species is appropriate only where "the loss of those individuals would be significant for the species as a whole"). No definitive threat of harm to killer whales exists here.

NMFS presented evidence supporting its expert conclusion that operation of the fishery pending remand will not jeopardize the Southern Resident killer whale. 2-ER-304–05 ¶ 10. As an initial matter, not all fish that go unharvested in the subject Alaska fisheries will become available as prey due to "natural mortality and harvest in other fisheries," such as Canadian fisheries. 3-ER-516–17 ¶¶ 30, 31; 2-ER-89–90 ¶ 31. NMFS estimated that fishing in *all* Southeast Alaska salmon fisheries—of which the fishery at

issue here is only a part—would reduce prey availability for killer whales by an average of only 0.5% in the coastal waters where whales are generally present during the winter and an average of only 1.8% in inland waters where whales are generally present during the summer. 2-ER-304 ¶ 9; 2-ER-57 ¶ 11; 2-ER-126 ¶ 11; *see* 5-ER-1126–27; 6-ER-1192. These reductions, "particularly in the most important locations and seasons for the whales, are small and . . . will not jeopardize their survival or recovery." 2-ER-302 ¶ 5. The reductions in prey expected to result from only the winter and summer seasons of the commercial Chinook salmon troll fishery would necessarily be lower. It is also worth noting that most of the salmon caught in Southeast Alaska fisheries are not from salmon stocks (that is, certain groups of salmon) that are currently considered of greatest importance to Southern Resident killer whales. 6-ER-1194–95 ("With the exception of the Columbia River brights that have relatively large run sizes, the whales' priority stocks are not a high proportion of the [Southeast Alaska] fisheries catch"); *compare* 5-ER-1129 (showing that, with the exception of Columbia Upriver bright stocks, the other stocks making the largest contributions to the Southeast Alaska catch list are not high on the Southern Resident killer whale priority list) *with* 6-ER-1193 (showing the highest-priority stocks for Southern Resident killer whales—Puget Sound and lower Columbia River fall stocks—account for only 2–3% of the total catch in the [Southeast Alaska] fisheries); 5-ER-970–71; 5-ER-1130–31.

NMFS and state, local, and tribal partners are also taking efforts to minimize impacts to killer whales and promote recovery, such as imposing mandatory and

voluntary vessel measures that reduce interference with killer whale foraging, cleaning up or reducing inputs of harmful contaminants, conservation hatchery programs (designed to restore wild fish populations), and habitat restoration projects. *See, e.g.,* 2-ER-310–11 ¶ 22; 6-ER-1193–95 ("starting in 2018, additional protective measures in U.S. and Canadian waters are being implemented to reduce impacts from fisheries and vessels in key foraging areas").

Relying on a declaration submitted by the Conservancy (which had projected that operation of the Southeast Alaska Chinook salmon fishery would reduce prey by 6%), the district court determined that "closing the troll fisheries in the manner requested would increase prey available to" killer whales, though it declined to make any factual findings over "how much prey" would ultimately reach the whale. 1-ER-34 (*citing* 4-ER-608–10 ¶¶ 8, 10, 11). But NMFS's experts reviewed the declaration and concluded that it was significantly flawed. 2-ER-302–04 ¶¶ 6–9. First, the declaration did not include most recent population updates (that is, the births of two calves in early 2022), and relied on "outdated correlations of coastwide Chinook abundance and survival or fecundity of [Southern Resident killer whales]." 2-ER-302–03 ¶ 6. The workgroup set up to advise the Pacific Fishery Management Council on the effects of salmon fisheries on Southern Resident killer whales found that these correlations "have weakened or are not detectable," and an expert panel "cautioned against overreliance on correlative studies or implicating any particular fishery in evaluating the status of [Southern Resident killer whales]." 2-ER-303 ¶ 7; 5-ER-972. In addition to this quantitative issue,

the Conservancy's declaration "overstate[s] the benefits that would likely be realized by the whales." 2-ER-303–04 ¶ 8. As noted in the declaration submitted by one of NMFS's experts with remedy briefing:

> Both the Chinook salmon prey and [Southern Resident killer whale] predators are highly mobile. Thus, not all of the Chinook salmon caught in [Southeast Alaska] troll fisheries would migrate south into [killer whale] habitat and those that would migrate south would not all survive or be intercepted by the whales.

*Id.*; *see also* 2-ER-513–16 ¶¶ 23, 29–30 (only a portion of the Chinook salmon harvested in the winter and summer seasons would return to Southern Resident killer whale habitat); 3-ER-516–17 ¶ 31. The Conservancy's calculation was further flawed because it failed to account for seasonal and spatial variability of Southern Resident killer whales. 2-ER-304 ¶ 9. The expert evidence submitted by NMFS showed that the Conservancy's declarant failed to account for all relevant factors in estimating the benefit of closing the fishery.

Instead of properly deferring to the agency's expertise, *Friends of Animals v. United States Fish & Wildlife Serv.*, 28 F.4th 19, 29 (9th Cir. 2022); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014), the district court declared in cursory fashion that despite the admitted "uncertainty as to how much prey would ultimately reach" killer whales, "closure of the fisheries meaningfully improves prey available to the [whale]." 1-ER-34, 39. But the small reductions in prey availability resulting from operating the fishery mean that any potential benefits of closing the fishery are just as small. This is all the more true because the prey increase program has

been in operation from 2020 to the present and has resulted in "a certain and definite increase in prey," 1-ER-36, available to whales during the remand period. *See also* 2-ER-304–05 ¶¶ 9–10; 2-ER-54–55, 59 ¶¶ 7, 15; 2-ER-123–24, 128 ¶¶ 7, 15; 2-ER-94 ¶ 41; 2-ER-99 ¶¶ 6-8; 2-ER-99–16.

This is particularly relevant given the short duration of the remand. NMFS plans to complete its new analyses pursuant to the district court's merits decision no later than November 2024. 2-ER-145–46 ¶ 5; *see also* 88 Fed. Reg. 54,301, 54,302 (Aug. 10, 2023) (notice of intent announcing NMFS's decision to prepare an environmental impact statement). Any limited impacts to killer whales that might result from the operation of the commercial Chinook salmon troll fishery during the remand period will accordingly be minimal.

Finally, vacatur has the potential to frustrate broader efforts to promote the recovery of ESA-listed species. NMFS works with its regional partners, including the States of Washington, Oregon, Alaska, and Tribes with treaty fishing rights, to manage fisheries and mitigate the effects of the fisheries and to establish a suite of restoration and recovery actions that benefit species such as endangered killer whales and threatened Chinook salmon. NMFS, with its regional partners, has worked very hard to promote actions that will recover killer whales. *See* 2-ER-310–11; 2-ER-332–36; *see also* 6-ER-1195 ("starting in 2018, additional protective measures in U.S. and Canadian waters are being implemented to reduce impacts from fisheries and vessels in key foraging areas"). One of these programs is the prey increase program, which balances

the prey needs of killer whales with the coastwide fisheries that target salmon allowed under the treaty. *See* 5-ER-887–89 (explaining that the United States decided to fund the prey increase program and other mitigation measures to "mitigate the effects of harvest and other limiting factors that contributed to the reduced status of Puget Sound Chinook salmon and [Southern Resident killer whales]," in addition to reducing harvest levels). Vacatur frustrates those efforts by pitting fishing communities against killer whale conservation. *See* 2-ER-64–65 ¶¶ 25, 27; 2-ER-133–34 ¶¶ 25, 27.

In sum, the district court lacked a sufficient basis for vacatur and abused its discretion when it erroneously discounted the many disruptive consequences of vacatur and improperly elevated the limited benefits provided to killer whales during the remand period.

## CONCLUSION

For all these reasons, the district court's order should be reversed insofar as it vacated the 2019 biological opinion and incidental take statement.

Of Counsel:

SHEILA LYNCH
*Attorney*
Office of General Counsel
National Oceanic and Atmospheric
    Administration
Seattle, WA

MOLLY E. WATSON
*Attorney*
Office of General Counsel
National Oceanic and Atmospheric
    Administration
Juneau, AK

September 29, 2023
DJ# 90-8-6-08342

*/s/ Thekla Hansen-Young*
TODD KIM
*Assistant Attorney General*

RACHEL HERON
REBECCA JAFFE
COBY HOWELL
FREDERICK H. TURNER
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any cases that are considered related within the meaning of Circuit Rule 28-2.

September 29, 2023
DJ# 90-8-6-08342

*/s/ Thekla Hansen-Young*
THEKLA HANSEN-YOUNG
*Attorney for Federal Defendants/Appellants*

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

I hereby certify that this brief contains 10,379 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.


/s/ Thekla Hansen-Young

September 29, 2023                    THEKLA HANSEN-YOUNG
DJ# 90-8-6-08342                     *Attorney for Federal Defendants/Appellants*