**Nos. 23-35322, 23-35323, 23-35324, 23-35354**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

WILD FISH CONSERVANCY,

Plaintiff-Appellee/Cross-Appellant,

vs.

JENNIFER QUAN, in her official capacity as the Regional Administrator for the National Marine Fisheries Service, et al.,

Defendants-Appellants/Cross-Appellees,

and

STATE OF ALASKA and ALASKA TROLLERS ASSOCIATION,

Intervenor-Defendants-Appellants/Cross-Appellees.

---

On Appeal from the United States District Court for the
Western District of Washington,
Case No. 2:20-cv-00417-RAJ-MLP

---

**ALASKA TROLLERS ASSOCIATION'S FIRST CROSS-APPEAL BRIEF**

---

Douglas J. Steding, WSBA #37020
Greg A. Hibbard, WSBA #60526
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564
dsteding@nwresourcelaw.com
ghibbard@nwresourcelaw.com

*Attorneys for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers Association, states that the Alaska Trollers Association, an Alaskan nonprofit trade association, has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

Dated this 29th day of September, 2023.

Respectfully submitted,

*s/ Douglas J. Steding*
Douglas J. Steding, WSBA #37020

*Attorney for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers Association*

i

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................1

II.     JURISDICTIONAL STATEMENT ...............................................5

III.    STATEMENT OF THE ISSUES ................................................6

IV.     STATEMENT OF THE CASE ....................................................7

   A.    The Treaty.................................................................7

   B.    The SEAK Troll Fishery. ...............................................9

   C.    2019 SEAK BiOp. .......................................................12

   D.    WFC's Complaint.......................................................15

   E.    The District Court's Ruling on the Merits. ..........................16

   F.    The District Court's Ruling on the Remedy...........................17

   G.    Appeal and Stay Pending Appeal......................................22

V.      SUMMARY OF ARGUMENT ....................................................24

VI.     STANDARD OF REVIEW .......................................................26

VII.    ARGUMENT....................................................................27

   A.    Equity Demands Remand Without Vacatur Here Given the Agency's
         Errors, the Speculative Benefits of Vacatur, and the Economic or Other
         Disruptive Consequences of Vacating the ITS. .......................27

      1.    Vacatur Is Not a Mandated Remedy for Agency Error. .....................27

2.    A Proper Application of the *Allied-Signal* Test Demonstrates that
      Equity Demands Remand Without Vacatur. .......................................29

   a.    NMFS's Likelihood to Substantiate the ITS on Remand
         Demonstrates that Its Errors Are Not So Serious as to Demand
         Vacatur. ...........................................................................30

   b.    The Disruptive Consequences of Vacating the ITS Far Outweigh
         NMFS's Errors or Any Speculative Environmental Benefit of an
         Interim Vacatur. ...............................................................33

      i.    Vacating the ITS Threatens a Way of Life Central to
            Communities in Southeast Alaska. .............................33

      ii.   Vacating the ITS Will Result in Devastating Economic Impacts
            to Communities in Southeast Alaska. .......................34

      iii.  Other Parties Have Offered Additional Perspective on the
            Disruptive Consequences of the District Court's Order. ..........35

      iv.   Closing the Troll Fishery Will Not Measurably Benefit the
            SRKW. ...................................................................36

3.    The District Court Abused Its Discretion in Concluding that the ITS
      Must Be Vacated While the Prey Increase Program Is Maintained....39

B.    The District Court Abused Its Discretion in Striking Portions or the Entirety of Two Declarations Submitted by the ATA in Its Briefing on the Remedy. ............................................................................. 42

1.    Paul Olson Has Sufficient Specialized Knowledge to Opine on the Economic Consequences of Closing the SEAK Troll Fishery. .......... 44

2.    Tad Fujioka Has Sufficient Specialized Knowledge to Opine on the Failure of WFC's Experts to Appreciate the Dynamics of Management of Fisheries Under the PST. .......................................... 48

VIII.  CONCLUSION ................................................................................. 49

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*

   988 F.2d 146 (D.C. Cir. 1993) ................................................................. 28, 29, 32

*Cal. Cmtys. Against Toxics v. EPA,*

   688 F.3d 989 (9th Cir. 2012) ............................................................ 27, 28, 29, 42

*City of Pomona v. SQM N. Am. Corp.,*

   750 F.3d 1036 (9th Cir. 2014) .............................................................................. 44

*Ctr. for Food Safety v. Regan,*

   56 F.4th 648 (9th Cir. 2022) ............................................................ 28, 29, 36, 41

*FTC. v. BurnLounge, Inc.,*

   753 F.3d 878 (9th Cir. 2014) ............................................................................... 43

*Hangarter v. Provident Life & Accident Ins. Co.,*

   373 F.3d 998 (9th Cir. 2004) ............................................................................... 47

*Kennedy v. Collagen Corp.,*

   161 F.3d 1226 (9th Cir. 1998) ............................................................................. 44

*Kenney v. United States,*

   458 F.3d 1025 (9th Cir. 2006) ....................................................................... 26, 39

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.,*

   109 F. Supp. 3d 1238 (N.D. Cal. 2015) .............................................................. 40

*Morales v. Hickman*,

    438 F.3d 926 (9th Cir. 2006) ........................................................... 26, 42

*Nat'l Family Farm Coal. v. EPA*,

    960 F.3d 1120 (9th Cir. 2020) ......................................................... 28, 29

*Nat'l Res. Def. Council v. EPA*,

    38 F.4th 34 (9th Cir. 2022) .............................................................. 28, 29

*Pit River Tribe v. U.S. Forest Serv.*,

    615 F.3d 1069 (9th Cir. 2010) ............................................................... 26

*Pollinator Stewardship Council v. EPA*,

    806 F.3d 520 (9th Cir. 2015) ........................................................... 28, 29

*Primiano v. Cook*,

    598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ................................. 44

*Sierra Club v. Marsh*,

    816 F.2d 1376 (9th Cir. 1987) ............................................................... 40

*Solar Energy Indus. Ass'n v. FERC*,

    --- F.4th ----, No. 20-72788, 2023 WL 5691711 (9th Cir. Sept. 5, 2023) ............ 30

*Tennessee Valley Auth. v. Hill*,

    437 U.S. 153 (1978) ....................................................................... 40, 41

*United States v. Hankey*,

    203 F.3d 1160 (9th Cir. 2000) ............................................................... 43

*United States v. Washington*,

   157 F.3d 630 (9th Cir. 1998)........................................................................26

*W. Watersheds Project v. McCullough*,

   No. 23-15259, 2023 WL 4557742 (9th Cir. July 17, 2023) ................................26

*Wendell v. GlaxoSmithKline LLC*,

   858 F.3d 1227 (9th Cir. 2017)........................................................... 27, 43

**Rules**

FRE 702 ........................................................................................................43

**Statutes**

16 U.S.C. § 1532 ..........................................................................................14

16 U.S.C. § 1536 ..........................................................................................12

16 U.S.C. § 1538 ..........................................................................................14

16 U.S.C. § 1539 ..........................................................................................14

# GLOSSARY OF ACRONYMS

ATA    Alaska Trollers Association

BiOp    Biological Opinion

ESA    Endangered Species Act

ITS    Incidental Take Statement

NEPA    National Environmental Policy Act

NMFS    National Marine Fisheries Service

PST    Pacific Salmon Treaty

SEAK    Southeast Alaska

SRKW    Southern Resident Killer Whale

WFC    Wild Fish Conservancy

## I.    INTRODUCTION

This appeal asks whether the district court abused its discretion in crafting an equitable remedy that: (1) will cause devastating cultural and economic harm to communities in Southeast Alaska; (2) avoids only speculative environmental harm to Southern Resident Killer Whales ("SRKWs") from harvesting Chinook salmon in Southeast Alaska; and (3) leaves in place the prey increase program intended to more than fully mitigate any harm to SRKWs associated with the harvest of salmon in Southeast Alaska. The district court committed legal and fact-finding errors in weighing the equities to determine whether to vacate the flawed agency decision. The order must be reversed and remanded with instructions to remand the agency's decision without vacatur.

Chinook salmon—some of which are listed as "threatened" or "endangered" under the Endangered Species Act ("ESA")—are preferred prey for the endangered SRKW. This case has singled out one fishery that harvests Chinook, the Southeast Alaska troll fishery ("SEAK troll fishery"), to address the plight of the SRKW. The SEAK troll fishery is one of many fisheries ranging from California up through Canada and Alaska that harvest Chinook salmon and are governed by the complex, interrelated, and comprehensive framework for salmon fisheries provided by the Pacific Salmon Treaty (the "PST" or "Treaty") between the United States and Canada.

In April 2019, Defendants-Appellants/Cross-Appellees National Marine Fisheries Services, et al. ("NMFS") issued their Southeast Alaska Biological Opinion ("2019 SEAK BiOp"), which consulted on multiple federal actions. The 2019 SEAK BiOp determined that those actions would not jeopardize the continued existence of listed species and provided an Incidental Take Statement (the "ITS") that granted Southeast Alaska fisheries "take" protection under the ESA regarding Chinook salmon and SRKWs, among other listed species. The federal actions at issue involved funding initiatives to implement the Treaty. Specifically, NMFS consulted on a "prey increase program" designed to provide a meaningful increase in Chinook prey to SRKWs and mitigate against limiting factors of the SRKW population, including Chinook harvests. That program was a key component of NMFS's jeopardy analysis and its issuance of the ITS. The ITS provided by the 2019 SEAK BiOp is crucial to the SEAK troll fishery—without it, the fishery cannot operate due to the risk of liability under the ESA.

In March 2020, almost a year after its issuance, Plaintiff-Appellee/Cross-Appellant Wild Fish Conservancy ("WFC") challenged the 2019 SEAK BiOp. The Alaska Trollers Association ("ATA") intervened in the litigation to provide a voice to the trollers and to protect their way of life. WFC alleged that NMFS's federal actions pursuant to its analysis under the 2019 SEAK BiOp violated multiple federal laws, including its obligation under the ESA to ensure that the actions did

not jeopardize the continued existence of SRKWs and Chinook salmon. The district court ruled in WFC's favor on the merits.

When determining the appropriate remedy, WFC requested that the district court vacate the prey increase program and the portions of the ITS that provided take protection to the two primary seasons of the SEAK troll fishery. WFC effectively advocated for the closure of a single fishery—the SEAK troll fishery—in the name of benefiting the SRKW despite the multi-national, multi-state, and multi-fishery management regime governing Chinook salmon harvests. In arguing for that relief, WFC overestimated the link between the SEAK troll fishery and the SRKW and disingenuously underestimated the impacts to the communities of Southeast Alaska that would result from closing their commercial troll fishery.

WFC's request for vacatur required the district court to undertake an equitable balancing test in crafting the appropriate remedy. The district court elected to vacate the ITS, as WFC requested, but not the prey increase program. That decision was an abuse of discretion because the court made legal and fact-finding errors. Central to these errors was the district court's favoring of SRKWs without regard for the actual threat of harm to the SRKW from the actions and the district court's failure to account for the significance of the disruptive consequences of vacatur.

Here, equity demands remand of NMFS's decision without vacatur. On the one hand, the record reflects that allowing the SEAK troll fishery to operate will do little, if anything, to harm the SRKW population—particularly in light of the available mitigation from the prey increase program that the district court rightly refused to enjoin. On the other hand, the record before this Court is replete with examples of how closing the SEAK troll fishery would have many significant disruptive consequences in the form of cultural harm, economic harm, and undermining the management of fisheries under the Treaty.

Trolling is a generational way of life that is rooted in great respect for the fish and the sustenance the fish provide. Closing the SEAK troll fishery will cause trollers to suffer harm to their cultural identity. Sixteen federally and state-recognized tribes in Alaska have also come forward to explain the cultural importance of trolling to their respective communities in a joint proposed *amici* filing. The economic consequences of closing the fishery will be debilitating. Individual trollers will be unable to maintain their livelihood. Communities that depend on taxes and economic activity that result from the fishery will struggle to maintain crucial public services. The indirect impacts of closing the troll fishery will further extend throughout Southeast Alaska to industries that depend on the fishery and communities large and small. Finally, as the Alaska Congressional

Delegation has explained, the district court's ruling risks undermining the careful management regime of salmon fisheries under the PST.

The ATA respectfully requests that the Court reverse the district court's order with instructions to remand NMFS's decision without vacatur.

## II.    JURISDICTIONAL STATEMENT

WFC brought claims against NMFS in the United States District Court for the Western District of Washington, pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), alleging violations of Section 7 of the ESA, 16 U.S.C. § 1536; the Administrative Procedure Act, 5 U.S.C. §§ 701–706; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12. 8-ER-1849, 1852, 1871–72.[1] Accordingly, the district court had federal question subject matter jurisdiction over the dispute under 28 U.S.C. § 1331. Venue was proper in the Western District pursuant to 28 U.S.C. § 1391(e) because WFC alleged that the violations, events, and omissions giving rise to its claims occurred within the Western District.

On May 5, 2023, the ATA filed its notice of appeal of the Western District's May 4, 2023 order granting, in part, WFC's Motion for Final Order on Relief and for a Temporary Restraining Order and/or a Preliminary Injunction

---

[1] For all references to the excerpts of record, the ATA refers to the Joint Excerpts of Record filed with NMFS's opening brief, ECF No. 58.

Pending Entry of a Final Order on Relief. 1-ER-0002 (Judgment in a Civil Case);

8-ER-1910 (ATA Notice of Appeal). That order was a final judgment, set out in

a separate document as required by Federal Rule of Civil Procedure 58. Because

the ATA initiated its appeal within thirty days of the district court's order, the

appeal was timely under Federal Rule of Appellate Procedure 4(a)(1). The Ninth

Circuit Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C.

§ 1291 because it is an appeal of a final decision from the United States District

Court for the Western District of Washington.

### III.   STATEMENT OF THE ISSUES

1.   Whether the district court abused its discretion in vacating the ITS for the

SEAK troll fishery when the agency is likely to reach the same decision

on remand and when vacatur would cause undisputed cultural and

economic harm to the communities of Southeast Alaska, while providing,

at best, a speculative benefit to SRKWs for which mitigation is provided.

2.   Whether the district court erred in striking portions of Paul Olson's

declaration referencing the economics at issue in this case under Federal

Rule of Evidence ("FRE") 702 when Mr. Olson has specialized

knowledge from his experience quantifying the value of Southeast

Alaska's fisheries and visitor economics to Alaska's coastal communities.

3. Whether the district court erred in striking Tad Fujioka's declaration under FRE 702 when Mr. Fujioka has specialized knowledge from his experience as a chairman and member of the Sitka Fish and Game Advisory Committee and providing advice to the Alaska Board of Fisheries on harvest, management, and allocation of Alaska's fishery resources.

## IV. STATEMENT OF THE CASE

This case involves the intersection of international, federal, and state management of salmon fisheries in the United States and Canada under the Treaty with management of listed species under the ESA—namely Chinook salmon and the SRKW. *See* 5-ER-0879–81. The issues at hand are complicated by the fact that Chinook salmon are preferred prey for SRKWs. 5-ER-0969. There are various "stocks" of Chinook salmon listed under the ESA—some are listed as "threatened" and others as "endangered." 4-ER-0858–59. The SRKW prefers some Chinook stocks over others as prey. *See* 5-ER-1129–31.

## A. The Treaty.

The United States and Canada first ratified the Treaty in 1985 to "provide[] a framework for the management of salmon fisheries" in the United States and Canada due to the migratory nature of salmon. 5-ER-0880, 0890. The Treaty "established fishing regimes that set upper limits on intercepting fisheries,

defined as fisheries in one country that harvest salmon originating in another country, and sometimes include provisions that apply to the management of… non-intercepting fisheries as well." 5-ER-0880. These regimes are designed to be implemented by each country and serve the salmon conservation, production, and harvest allocation goals set forth in the Treaty. *Id.* Those regimes apply to fisheries in Canada, Alaska, and the "southern U.S.," meaning California, Oregon, and Washington. 5-ER-0881, 0883.

The Treaty was renegotiated and renewed in 1999, 2009, and, most recently, in 2019.[2] 5-ER-0880–81. Under the fishing regimes, the United States, through NMFS and the North Pacific Fishery Management Council, delegates management of the Southeast Alaska fisheries in the United States' exclusive economic zone to the State of Alaska. 5-ER-0882. There are currently two such fisheries—the salmon troll fishery and the sport salmon fishery. 5-ER-0884. As a result, the SEAK troll fishery that is the subject of the district court's order represents one fishery within this management regime that governs many fisheries from multiple states and nations.

---

[2] The renewed agreement was agreed upon by the parties in 2018 but took effect in 2019 and is referenced as the "2019 Agreement" or "2019 PST Agreement." 5-ER-0881.

**B.      The SEAK Troll Fishery.**

The ATA intervened in this litigation to defend the SEAK trollers. The ATA is a Juneau-based nonprofit commercial trade organization that represents approximately 450 members that participate in and derive their livelihoods from the troll fishery. 2-ER-0072. Trolling is a unique form of commercial fishing that represents a generational way of life for much of Southeast Alaska. *See* 3-ER-0543–48; 2-ER-0072. Trollers harvest one salmon at a time and, thus, have great respect for the salmon that offer their bodies to sustain the trollers with healthy food. 3-ER-0545. Due to this reliance and respect, trollers consider themselves conservationists for salmon such as the Chinook. 3-ER-0544–45; 8-ER-1785. For decades under the Treaty, the SEAK trollers have sacrificed much as their allowable catch has been significantly decreased. *See* 5-ER-0898 (SEAK fisheries were reduced by 7.5 percent and fifteen percent in the 2019 and 2009 negotiations of the Treaty, respectively). Third-generation troller Eric Jordan has provided an eloquent description on what it means to be a troller in these trying times. 3-ER-0543–48.

The SEAK troll fishery consists of three seasons each year: winter (October through April), spring (May through June), and summer (July through September). 5-ER-1004. Closing the winter and summer seasons would effectively close the entire fishery because the short spring season cannot support

9

the entire fishery. 2-ER-0073. Even one year of losing the fishery would cause most trollers to stop fishing as they would not be able to afford to transition to another fishery and would have difficulty meeting their significant fixed costs. 2-ER-0073–74.

The SEAK troll fishery also has broad importance throughout the communities in Southeast Alaska. Nearly 72,500 people live in the thirty-three communities of Southeast Alaska. 2-ER-0073. Communities such as Edna Bay, Elfin Cove, Meyers Chuck, Point Baker, Port Protection, Port Alexander, and Pelican are historical fishing villages that remain almost exclusively reliant on commercial fishing. *Id.* Given the high percentage of residents who possess commercial troll permits (2-ER-0231–32 (Table 2)), the troll fishery is the most important fishery to those communities. 2-ER-0073. Without the troll fishery, those historical fishing villages would lose significant income that helps pay for crucial city services such as education, water/wastewater, electricity, snowplowing, trash, boardwalk/harbor repairs, and public health and safety. 3-ER-0524. Ultimately, losing the fishery for one year will result in an economic loss between over $72 million and $85 million across Southeast Alaska. 3-ER-0520.

The impacts from the SEAK fisheries, including the troll fishery, on prey availability for the SRKW are limited. Prey availability was not the origin of the SRKW population concerns—"the current small size of the SRKW population

10

was not caused by lack of salmon," but the reduced population size is "due in large part to the legacy of an unsustainable live-capture fishery for display in aquariums." 6-ER-1312. Currently, the SRKW population is threatened by prey availability, vessel noise and disturbance, and persistent chemical contamination or pollution. 5-ER-0962; 6-ER-1308. The impacts from the SEAK fisheries, including the SEAK troll fishery, are limited by both the timing of the troll fishery's harvest and the stocks of Chinook salmon that compose those harvests. Specifically, "[w]ith the exception of the Columbia River brights, that have a relatively large run size, the largest stocks contributing to the SEAK fisheries catch are currently not considered at the top of the priority prey list for SRKWs." 5-ER-1131. Those other stocks "ranked high on the priority list… make up a smaller proportion of the fishery catch (approximately 2 to 3 percent of the total catch for the SEAK fisheries) and catch a relatively lower proportion of the total run size of those stocks." 6-ER-1193.

Furthermore, even if the highest hypothetical impact to prey availability resulted from the SEAK fisheries' harvests, those impacts "would likely occur rarely" and would occur in the coastal range "during a time period when the whales are more often observed in inland waters," spreading the impacts "across a large area where the whales would not have access to all of the Chinook salmon or be expected to experience localized prey depletion." 6-ER-1194.

11

Ultimately, an independent science panel assessing the impacts of fisheries on prey availability for SRKWs "cautioned against overreliance on correlative studies or implicating any particular fishery." 5-ER-0972.

## C.    2019 SEAK BiOp.

In 2019, NMFS took action to continue implementation of the Treaty and analyze the effects of the SEAK fisheries on listed species under the ESA. *See* 5-ER-0881. Specifically, NMFS conducted consultation pursuant to the ESA on three federal actions related to the 2019 version of the Treaty and the management of SEAK fisheries to ensure that those actions did not jeopardize the continued existence of listed species. 5-ER-0883–90; 16 U.S.C. § 1536(2) (imposing obligation to ensure that an action "is not likely to jeopardize the continued existence of any endangered species or threatened species"). Here, the two relevant listed species are the SRKW and the Chinook salmon. 5-ER-0882. NMFS's consultation regarding these three federal actions was memorialized in NMFS's 2019 SEAK BiOp on April 5, 2019.[3] *See* 4-ER-0858.

The first action was NMFS's continued delegation of management authority over the SEAK troll fishery and sport salmon fishery to the State of

---

[3] One noteworthy aspect of this case, although not uncommon, is that NMFS was both the "action agency" and the "consulting agency," meaning that the agency consulted with itself to satisfy the requirements of the ESA. *See* 4-ER-0858–61 (listing NMFS as both an action agency and a consulting agency).

Alaska. 5-ER-0884. The second action was for a federal funding initiative to implement the 2019 Treaty. 5-ER-0884–87. The third action was funding of a conservation program designed for the benefit of critical Puget Sound stocks of Chinook salmon and SRKWs. 5-ER-0887–90. The conservation program funding consisted of three components: (1) continuation of conservation hatchery programs targeted at the weakest Puget Sound Chinook populations; (2) funding to address limiting habitat conditions for the same weakest Puget Sound Chinook populations; and (3) a "mitigation funding initiative" that "was specifically designed to increase the production of hatchery Chinook salmon to provide an immediate and meaningful increase in prey availability for SRKWs." 5-ER-0888, 1105. While the first two components of that third action will increase Chinook salmon abundance and prey availability for SRKWs, the third component, otherwise known as the "prey increase program," is most relevant to this appeal. *See* 5-ER-1118. The 2019 SEAK BiOp concludes that the prey increase program will increase SRKW prey by four to five percent "in the times and areas most important to SRKWs," helping offset impacts in SRKW prey reduction from SEAK fisheries, other baseline fisheries, and other limiting factors for the SRKW population. 5-ER-0888–90, 1133; 6-ER-1193 (explaining that targeted funding initiative was intended to mitigate impacts from SEAK fisheries, Canadian fisheries, and "SUS," or southern U.S. fisheries).

13

NMFS relied, in part, on the mitigation of impacts to SRKWs provided by the prey increase program to conclude that the three proposed federal actions would not jeopardize the continued existence of listed Chinook, the SRKW, and other ESA-listed species. 4-ER-0858–61; 6-ER-1195.

To ensure that those actions were conducted consistent with the 2019 SEAK BiOp analysis and the ESA, the 2019 SEAK BiOp included an ITS that applied to all of the SEAK salmon fisheries that are regulated under the PST by the State of Alaska. 6-ER-1204–14. An ITS effectively exempts an action or actions from the ESA's general prohibition against "take"[4] of a listed species by allowing such take to occur provided the action is performed in compliance with the terms and conditions of the ITS. *See* 16 U.S.C. § 1538(a)(B) (prohibiting take of any listed species); 16 U.S.C. § 1539(a)(1)(B) (granting authority for permitted take incidental to otherwise lawful activity); 6-ER-1204 (explaining need to comply with provided ITS). As relevant here, the ITS associated with the 2019 SEAK BiOp provided coverage for incidental take of SRKWs and Chinook salmon resulting from the SEAK fisheries' harvests. 6-ER-1204–06. In short, the ITS allows the SEAK troll fishery to operate without threat of liability under the ESA.

---

[4] Under the ESA, "'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

**D.    WFC's Complaint.**

On March 18, 2020, WFC filed its complaint in the United States District Court for the Western District of Washington. *See generally* 8-ER-1845. WFC alleged three claims: (1) that NMFS failed to ensure no jeopardy to SRKWs and Chinook salmon under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2); (2) that NMFS's 2019 SEAK BiOp was arbitrary and capricious, and not in accordance with law under the Administrative Procedure Act; and (3) that NMFS failed to conduct required analyses under NEPA. 8-ER-1871–72. The case was referred to a United States Magistrate Judge, the Honorable Michelle L. Peterson, on April 17, 2020. 8-ER-1820. The ATA's motion to intervene to defend its interests related to the SEAK troll fishery was granted on April 23, 2020. 8-ER-1803.

WFC first sought a preliminary injunction to stay the take authorization in the 2019 SEAK BiOp, stay federal delegation of authority for the SEAK fisheries to the State of Alaska, and prevent the 2020 summer fisheries from commencing. 7-ER-1587. The district court denied WFC's motion because it was not timely filed under the Magnuson-Stevens Act. *See* 7-ER-1604; 4-ER-0823. The State of Alaska (the "State") then successfully intervened in the matter on March 30, 2021. 4-ER-0821.

**E.     The District Court's Ruling on the Merits.**

The proceedings below were conducted in two stages, pertaining to the merits and the remedy, respectively. After the parties filed their respective motions for summary judgment or cross-motions for summary judgment, the district court adopted verbatim Magistrate Judge Peterson's report and recommendation and ruled in favor of WFC on the merits.[5] 4-ER-0612–15. The district court's decision to grant WFC's motion for summary judgment consisted of four holdings relevant to this appeal.

First, the court held that the 2019 SEAK BiOp was arbitrary, capricious, and not in accordance with law. 4-ER-0638–46. The district court found that NMFS procedurally violated the ESA when it relied on uncertain mitigation from the prey increase program to support its no jeopardy finding with respect to SRKWs and that NMFS failed to make a jeopardy determination on the prey increase program's impacts on listed Chinook salmon. *Id.* Second, as a consequence of NMFS's flawed procedural ESA violations, the district court held that NMFS violated its substantive duties to ensure no jeopardy to the SRKW and Chinook salmon resulting from the proposed actions. 4-ER-0646–47. Third, the district court held that NMFS violated NEPA by failing to conduct

---

[5] As a result, all references to the district court's findings or holdings will refer to the magistrate judge's report and recommendation.

sufficient environmental analysis in issuing the ITS. 4-ER-0647. Lastly, the

district court held that NMFS violated NEPA by failing to conduct an

environmental analysis for the prey increase program. 4-ER-0650–51.

**F.     The District Court's Ruling on the Remedy.**

After that ruling on the merits, WFC moved for a final order on relief.[6]

1-ER-0006. During the briefing on the remedy, WFC also moved to strike

multiple declarations offered by NMFS, the ATA, and the State in support of

their remedy briefing. 1-ER-0020. The report and recommendation granted

WFC's motion to strike with respect to the ATA's declarants and granted WFC's

motion for a final order on relief in part. 1-ER-0027–28, 0044–45. Once again,

the district court adopted the report and recommendation verbatim. 1-ER-0004.

Regarding WFC's motion to strike, the court refused to consider any

opinion on economics from ATA member Paul Olson and refused to consider

ATA member Tad Fujioka's opinions altogether. 1-ER-0027–28. The court held

that "Mr. Olson's overall background and work history do not support a minimal

foundation to provide an expert opinion regarding the economics at issue in this

case" under FRE 702. *Id.* (internal quotation marks omitted). Similarly, the court

---

[6] WFC also moved for a temporary restraining order and/or a preliminary
injunction pending entry of the final order from the magistrate judge. 1-ER-0007.
That request was denied because, as the report and recommendation explained,
such relief could only be granted by the district court. *Id.*

held that Mr. Fujioka failed to identify sufficient background or "specialized experience in data analysis that would qualify him to provide an expert opinion on impacts to the fisheries from closure or to rebut [the] population viability analysis" presented by WFC's expert Dr. Robert Lacy. 1-ER-0028.

Regarding the remedy, the district court granted a portion of the remedy proposed by WFC, remanded the 2019 SEAK BiOp, and vacated the "portions of the 2019 SEAK BiOp concerning the incidental take statement that authorizes 'take' of the Southern Resident Killer Whale and Chinook salmon resulting from commercial harvests of Chinook salmon during the winter and summer seasons (excluding the spring season) of the troll fisheries." 1-ER-0005. The court denied WFC's request that the "portions of the 2019 SEAK BiOp that adopt, and consult under Section 7 of the ESA on NMFS's prey increase program be vacated and/or enjoined."[7] *Id.*

The district court held that the presumptive remedy for NMFS's ESA violations was to vacate the 2019 SEAK BiOp and the ITS for the SEAK fisheries. 1-ER-0029. However, the court noted that WFC requested a "partial vacatur"—seeking to vacate the ITS to the extent that it allows the SEAK troll fishery to harvest in the winter and summer and vacate the prey increase

---

[7] Given its refusal to vacate the prey increase program, the district court also denied WFC's request to permanently enjoin implementation of the program. 1-ER-0042–44.

program. *Id.* The district court evaluated whether to vacate the ITS and the prey increase program, individually, with a three-pronged analysis: (1) "weigh[ing] the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed"; (2) whether "vacating or leaving the decision in place would risk environmental harm"; and (3) whether the agency could reach the same decision on remand with better reasoning. 1-ER-0030 (internal quotation marks omitted).

In the first prong of its analysis, the court first determined that errors that NMFS committed under the ESA and NEPA were serious. 1-ER-0031–33. When weighing those errors against the disruptive consequences, the court explained that it was required to "tip the scale in favor of protecting listed species in considering vacatur" because the ESA "singled out the prevention of species extinction." 1-ER-0034 (internal quotation marks and brackets omitted). Under that reasoning, the court held that it "largely should focus on potential environmental disruption, as opposed to economic disruption." 1-ER-0033 (internal quotation marks omitted). The court nevertheless explained that it would "consider" economic consequences because it was commonplace to do so in the Ninth Circuit. 1-ER-0034.

With respect to the ITS, although the district court recited some of the estimates offered by the parties of economic impacts from vacating, the court

concluded that those economic disruptions did not "overcome the seriousness of NMFS's violations given the presumption of vacatur, the harm posed to the SRKW by leaving the ITS in place and the Court's mandate to protect the endangered species." 1-ER-0035.

The court reached the opposite conclusion pertaining to the prey increase program—finding that vacating the program would result in "pronounced environmental and economic disruption." *Id.* The court contrasted its ruling on the merits that NMFS's no jeopardy analysis was flawed because the prey increase program was unspecified and uncertain, holding that "[t]he prey increase program—though previously uncertain and indefinite in the 2019 SEAK BiOp—has also now been funded and begun providing prey the past three years." *Compare* 4-ER-0646–47 *with* 1-ER-0036. In reaching that conclusion, the court acknowledged that "[t]he prey increase program is on track to provide the benefits to SRKWs that were anticipated in the 2019 SEAK BiOp on the effects of domestic actions associated with implementing the 2019 PST." 1-ER-0036 (internal brackets and quotation marks omitted). As a result, the court reasoned that "the disruptive consequences of vacatur of the prey increase program would ultimately put the SRKW at further risk of extinction." 1-ER-0038.

In the second prong of its analysis—whether vacating or leaving in place the ITS and the prey increase program would cause environmental harm—the district court again reached differing conclusions. Regarding the ITS, the court held that "[t]he risk of environmental harm to the SRKW from leaving the ITS in place, and by otherwise not allowing for an increased amount of prey to benefit the SRKW, therefore counsels in favor of vacatur of the ITS." 1-ER-0039. In contrast, the court found that "vacatur of the prey increase program would assuredly result in environmental harm to the SRKW by eliminating a targeted source of prey." *Id.* Although WFC also alleged harms to wild Chinook populations from the prey increase program, the court explained that the record reflected that such hypothetical harms from hatcheries "can be mitigated to limit any potential negative impacts." 1-ER-0040. Thus, according to the court, any potential harm to wild Chinook did not outweigh "certain environmental harm to the SRKW by eliminating a targeted source of prey." *Id.*

Finally, the court found that the third prong of its analysis "appear[ed] to favor vacatur of the ITS and the prey increase program because there is no guarantee the same rule on remand could reissue." 1-ER-0041. The court noted that the third prong may support remand without vacatur with respect to the prey increase program, explaining that "NMFS now appears poised on remand to remedy deficiencies in the 2019 SEAK BiOp with more specific and definite

consideration of the mitigation measures now that they have been funded and in place, and the impacts of the program on [listed Chinook] can be better quantified and qualified." *Id.* The court made no finding regarding how the recognized certainty of the mitigation provided by the prey increase program would impact the ITS decision on remand. *See id.*

As a part of the objection process to the magistrate judge's report and recommendation, the Alaska Congressional Delegation filed an *amicus* brief in support of Defendants and Defendant-Intervenors. *See generally* 2-ER-0135; 8-ER-1935 (district court ECF No. 161).

### G.    Appeal and Stay Pending Appeal.

In response to the court's remedy ruling, the court entered its final judgment. *See* 1-ER-0002. The State, WFC, ATA, and NMFS all appealed the judgment to this Court. *See* 8-ER-1899–21. The State then moved the district court to stay the portion of its order vacating the ITS. *See* 8-ER-1936 (district court ECF No. 172). The ATA joined in that motion. *Id.* (district court ECF No. 173). WFC also moved for post-judgment relief from the district court—moving for an injunction of the prey increase program while pending appeal. *Id.* (district court ECF No. 177). The district court denied both motions. 2-ER-0066.

The State and WFC then each filed similar motions to their respective motions before the district court, each requesting the same relief from this Court.

ECF No. 15; ECF No. 19. [8] The ATA again joined in the State's motion. ECF No. 20. The Alaska Congressional Delegation moved to file an *amicus* brief in support of the State's motion to stay. ECF No. 27-1. Sixteen federally and state-recognized Tribes located in Alaska also moved to file an *amicus* brief in support of the State's motion. ECF No. 42-1. The Tribal *Amici* acknowledged that they moved to file their support more than seven days after the motion but asserted that there was "good cause" for the Court to consider their filings. *Id.* at 6.

In one ruling, the Court granted the State's motion (the "Stay"), denied WFC's motion, and granted the Alaska Congressional Delegation's motion. ECF No. 48 at 3-5. The Court remained silent on the Tribal *Amici*'s motion. *See generally id.* The Court granted the Stay because "the moving parties have established a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Alaskan salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." *Id.* at 4. In rejecting WFC's motion, the Court held that WFC did not "demonstrate[] that the district court likely abused its discretion in declining to vacate the prey increase program, particularly in light of the district court's finding that the disruptive consequences of vacatur would ultimately put

---

[8] All references to the Ninth Circuit's docket refer to Court of Appeals Docket No. 23-35322 as the primary case of the consolidated appeal.

the whales at further risk of extinction and outweigh the seriousness of the agency's errors." *Id.* at 5.

The matter now comes before the Court on the merits of the district court's vacatur decision.

## V. SUMMARY OF ARGUMENT

On its own, a violation of law does not demand vacatur. Remand without vacatur is appropriate when equity demands that outcome. When undertaking the equitable analysis of whether to vacate a flawed agency decision or rule, a district court must balance or weigh the seriousness of an agency's errors and the disruptive consequences of vacating the agency's decision.

The seriousness of the error is informed by whether the agency could reach the same decision on remand, with better reasoning or additional support. Additionally, the seriousness of the errors must be weighed against the disruptive consequences of vacating the decision.

The ATA is not appealing the district court's opinion on the merits that NMFS committed serious errors when it violated NEPA and the ESA with its 2019 SEAK BiOp. However, given the district court's ruling that crucial faults with the 2019 SEAK BiOp—namely the certainty associated with the prey increase program—have been alleviated, there is a serious possibility that NMFS will be able to substantiate its decision and the ITS on remand. Such errors pale

in comparison to the certain cultural and economic devastation that will befall communities across Southeast Alaska if the ITS is vacated and the SEAK troll fishery is closed.

The district court abused its discretion in crafting an equitable remedy that vacated the ITS. The district court committed legal error by tipping its equitable analysis in favor of the SRKW without regard for the only speculative harm to the species that would result from no vacatur. The district court also committed a fact-finding error by failing to appreciate the magnitude of the disruptive consequences that will result from vacating the ITS. The ATA respectfully submits that the district court's ruling must be reversed.

The ATA appeals two additional decisions by the district court. The district court abused its discretion in striking the declarations of ATA members Paul Olson and Tad Fujioka. Had the court properly applied the relaxed FRE 702 standard for expert testimony, it would have recognized the specialized knowledge that qualified both individuals to opine on the economics and fisheries management issues presented by this dispute. Had the court considered the information presented by both individuals, the court would have been better informed for its equitable decision to craft the remedy.

# VI.     STANDARD OF REVIEW

This Court reviews the first issue on appeal—the district court's vacatur of the ITS—for an abuse of discretion. *W. Watersheds Project v. McCullough*, No. 23-15259, 2023 WL 4557742, at *3 (9th Cir. July 17, 2023); *see also Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010) (the Ninth Circuit "review[s] for an abuse of discretion the district court's equitable orders"). "The district court abuses its discretion when its equitable decision is based on an error of law or a clearly erroneous factual finding." *Kenney v. United States*, 458 F.3d 1025, 1032 (9th Cir. 2006) (quoting *United States v. Washington*, 157 F.3d 630, 642 (9th Cir. 1998)). "An abuse of discretion is a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Morales v. Hickman*, 438 F.3d 926, 930 (9th Cir. 2006) (internal quotation marks omitted).

The remaining two issues on appeal concern the district court's refusal to consider testimony from two ATA members as expert evidence under FRE 702. The ATA preserved this argument for appeal by arguing at oral argument that WFC's motion to strike should be denied and objecting to the district court's ruling to the contrary during the objection process following Magistrate Peterson's report and recommendation on the remedy. *See* 2-ER-0148–50, 0157–58. This Court "review[s] the district court's ruling on the admissibility of expert testimony for an

abuse of discretion." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1231 (9th Cir. 2017). However, this Court "review[s] *de novo* the construction or interpretation of the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule." *Id.* (internal quotation marks and ellipses omitted).

## VII.     ARGUMENT

### A.     Equity Demands Remand Without Vacatur Here Given the Agency's Errors, the Speculative Benefits of Vacatur, and the Economic or Other Disruptive Consequences of Vacating the ITS.

The district court abused its discretion in vacating the portions of the 2019 SEAK and ITS that authorize "take" of SRKWs and Chinook salmon from SEAK troll fishery harvests of Chinook salmon during the winter and summer seasons of the fishery. The district court's decision failed to properly weigh the economic and other disruptive consequences and against the agency's errors and the speculative environmental impacts. The ATA respectfully requests that the Court reverse the district court's ruling on this first issue on appeal.

#### 1.     Vacatur Is Not a Mandated Remedy for Agency Error.

"A flawed [agency] rule need not be vacated." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Instead, "when equity demands, the

regulation can be left in place while the agency follows to the necessary procedures to correct its action." *Id.* (internal quotation marks omitted).[9]

The core of the analysis when determining whether to vacate a flawed agency rule, order, or decision is the two-pronged "*Allied-Signal* test." That test, set forth by the D.C. Circuit Court of Appeals, provides that the "decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted). That test has been consistently applied in the Ninth Circuit. *See e.g.*, *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022); *Nat'l Res. Def. Council v. EPA*, 38 F.4th 34, 51-52 (9th Cir. 2022); *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144-45 (9th Cir. 2020); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *Cal. Cmtys. Against Toxics*, 688 F.3d at 992.

In the first prong of the *Allied-Signal* test, the Ninth Circuit "look[s] to whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or

---

[9] The ATA joins NMFS's argument that no presumption of vacatur should be applied. ECF No. 57 at 20-24. Regardless of any presumption, the ATA asserts that vacatur is not appropriate under the vacatur standard.

whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Ctr. for Food Safety*, 56 F.4th at 663-64; *see also Nat'l Res. Def. Council*, 38 F.4th at 51-52; *Nat'l Family Farm Coal.*, 960 F.3d at 1144-45; *Pollinator Stewardship Council*, 806 F.3d at 532. For instance, in *Allied-Signal*, the court declined to vacate the agency order because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand." 988 F.2d at 151.

Under the second prong of the *Allied-Signal* test, courts "consider whether vacating a faulty rule could result in possible environmental harm… and the disruptive impact of vacatur." *Ctr. for Food Safety*, 56 F.4th at 668 (internal quotation marks omitted). As this Court recognized with the Stay, that test counsels against vacatur when the results would be "economically disastrous." ECF No. 48 at 4 (quoting *Cal. Cmtys. Against Toxics*, 688 F.3d at 992).

The Ninth Circuit considers the *Allied-Signal* test to be a "two-factor balancing test" that requires a court to "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Ctr. for Food Safety*, 56 F.4th at 663.

### 2. A Proper Application of the *Allied-Signal* Test Demonstrates that Equity Demands Remand Without Vacatur.

In this matter, equity demands remand without vacatur of the ITS. First, due to the likelihood that NMFS will be able to substantiate the ITS for the winter and

summer seasons of the SEAK troll fishery on remand, NMFS's errors are not so serious that they demand vacatur of the ITS. Second, the certain economic devastation and other consequences that will result from vacating the ITS outweigh the agency's errors and any speculative environmental benefit from vacatur or any speculative environmental threat from remanding without vacatur.

> ### a. NMFS's Likelihood to Substantiate the ITS on Remand Demonstrates that Its Errors Are Not So Serious as to Demand Vacatur.

In its decision on the merits, the district court found two primary errors pertaining to the ITS. The court held that NMFS violated NEPA in issuing the ITS because the ITS "constituted a major federal action" that required NMFS to complete an environmental assessment or environmental impact statement under NEPA before issuing the ITS. 4-ER-0650. The court also held that NMFS violated its substantive obligation to ensure against jeopardy to the SRKW under the ESA. 4-ER-0646.

Relevant to WFC's NEPA claims, this Court has recently emphasized that NEPA is a "purely procedural statute" and held that although a failure to conduct NEPA analysis may typically require vacatur, remand without vacatur is appropriate when there will be "significant disruptive consequences of vacatur." *Solar Energy Indus. Ass'n v. FERC*, --- F.4th ----, No. 20-72788, 2023 WL 5691711, at *28 (9th Cir. Sept. 5, 2023) (recognizing disruptive consequences of

forcing states to undo investments complying with flawed rule and readopt new rules). As demonstrated below, NMFS's NEPA violations in this matter fall into the category of violations where remand without vacatur is appropriate despite serious errors because vacating the ITS will result in severe disruptive consequences to the communities of Southeast Alaska.

Regarding WFC's ESA claims, the court held that "the central point at issue" was that "the prey increase program [was] NMFS's essential long-term mitigation solution to NMFS's proposed actions," including the continued authorization of Alaska's management of the Southeast Alaska fisheries. 4-ER-0641. In the merits stage of this matter, the court found that the prey increase program was not sufficiently specific or reasonably certain to occur to qualify as mitigation. 4-ER-0641–44. Thus, the court held that NMFS's reliance on the prey increase program as justification for its no jeopardy determination and issuance of the ITS was arbitrary and capricious. 4-ER-0646.

When it came time for the court to craft the appropriate equitable remedy to address the ESA and NEPA violations, its view of the prey increase program had changed. By that point, the court explained that the prey increase program "has been fully funded for the past three years." 1-ER-0016. As a result, although the court previously considered the prey increase program to be "uncertain and indefinite," the program has been providing prey and "is on track to provide the

benefits to SRKWs that were anticipated in the 2019 SEAK BiOp." 1-ER-0036
(internal quotation marks and brackets omitted).

The district court's finding that the prey increase program was no longer
speculative undercuts the court's reasoning for vacating the ITS. The primary
reason that the district court found the no jeopardy determination and ITS violated
the ESA during the merits stage was NMFS's reliance on the speculative
mitigation from the prey increase program. The court held at the time of the
remedy phase of the litigation that those concerns had been alleviated. In fact, one
reason the district court declined to vacate the program was that the district court
recognized that the now certain program could be justified on remand. However,
the court made no observation on how the certainty of the mitigation would impact
the no jeopardy and ITS analysis. It stands to reason that, if the mitigation was on
track to provide the intended benefits, the certain mitigation would further bolster
the ITS on remand. As such, "there is at least a serious possibility that [NMFS]
will be able to substantiate its decision on remand." *Allied-Signal, Inc.*, 988 F.2d at
151. That possibility suggests that the errors are not so serious to outweigh the
severe disruptive consequences that will result from vacatur.

      **b.**    **The Disruptive Consequences of Vacating the ITS Far Outweigh NMFS's Errors or Any Speculative Environmental Benefit of an Interim Vacatur.**

This Court, in granting the Stay, has already recognized a likelihood "that the certain and substantial impacts of the district court's vacatur on the Alaskan salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." ECF. No. 48 at 4. Although WFC has repeatedly downplayed its requested relief as merely "partial vacatur" (*see* 1-ER-0030) with limited impacts on the communities of Southeast Alaska, the record is replete with evidence of the true magnitude of impacts to the culture and economies of Southeast Alaska.

      **i.**    **Vacating the ITS Threatens a Way of Life Central to Communities in Southeast Alaska.**

The impacts of vacatur are not just about numbers—although the numbers explaining the detrimental impacts to the economies of many communities are significant. Trolling is personal. 3-ER-0544. Trolling is a way of life. 3-ER-0545. Trolling is the harvest of one Chinook salmon at a time with great respect for the fish that sustain the trollers of Southeast Alaska. *Id.* Third-generation troller Eric Jordan explained in detail the physical, spiritual, and cultural importance of Chinook salmon and trolling to him and many other families in Southeast Alaska. 3-ER-0543–48. Mr. Jordan artfully describes the suffering that SEAK trollers will endure—effectively bringing an end to a generational way of life—if vacatur is

granted. 3-ER-0544–48. The ATA respectfully implores the Court to review Mr. Jordan's declaration to obtain a complete understanding of the impacts of the district court's order.

> ### ii. Vacating the ITS Will Result in Devastating Economic Impacts to Communities in Southeast Alaska.

The detrimental economic impacts of the district court's decisions are also staggering. Closing the troll fishery for the winter and summer seasons would close the fishery for nine of the twelve months of the year. 2-ER-0073. Because three months of a spring season cannot sustain the entire troll fishery, and there are cost and regulatory barriers for trollers to enter other fisheries, the district court's vacatur of one year's worth of the fishery would effectively cause most trollers to cease fishing altogether. 2-ER-0073–74. Thus, vacatur threatens the livelihood of those trollers.

The resulting harm will be felt in individual Southeast Alaskan communities. Entire communities across Southeast Alaska are disproportionately dependent on the direct and indirect economic activity resulting from the SEAK troll fishery. There are at least six other "historical fishing villages that rely almost exclusively on commercial fishing." 2-ER-0073.

For instance, according to Mayor Patricia Phillips of Pelican, Alaska, closing the troll fishery would place Pelican's year-round residents at risk of maintaining

their livelihood. 3-ER-0524. In addition to the thirty percent of the city's population that participates in the troll fishery for their own livelihood, the raw fish tax is an important source of funding for crucial city services such as education, water/wastewater, electricity, snowplowing, trash, boardwalk/harbor repairs, and public health and safety. *Id.* The troll fishery is also crucial to local businesses in Pelican—the port and local café are highly dependent on the business that the trollers bring in each year. *Id.* Without the troll fishery, the local port would struggle to remain viable, and the entire City of Pelican would be forced to endure dire circumstances. 3-ER-0524–25.

The impacts are not unique to small communities—the economic output of the two seasons of the Chinook troll fishery at issue amounts to $29 million per year. 3-ER-0521. In addition to the direct loss of that output, dependent industries, namely fish processing plants, will also suffer from the closed fishery. 3-ER-0519. Taking the "multiplier effect" of all direct and indirect impacts into account demonstrates that the total economic impact of closing the fishery ranges between over $72 million and $85 million. 3-ER-0520.

### iii. Other Parties Have Offered Additional Perspective on the Disruptive Consequences of the District Court's Order.

The ATA notes that multiple *amici curiae* filings in the district court and before this Court have brought forth additional disruptive consequences that

further demonstrate the necessity to remand without vacatur. The Alaska

Congressional Delegation explained that vacating the ITS and closing the SEAK

troll fishery would frustrate the balance and objectives of the Treaty. *See generally*

ECF No. 27-1; 2-ER-0135. Similarly, sixteen federally and state-recognized Tribes

located in Southeast Alaska submitted an *amicus* brief, collectively, highlighting

"the devastating and disproportionate impact that closure of the troll fishery will

have on indigenous communities in Southeast Alaska." ECF No. 42-1 at 3. The

ATA respectfully requests that the Court consider these materials as further

evidence of the extreme magnitude of the disruptive consequences at issue.

### iv. Closing the Troll Fishery Will Not Measurably Benefit the SRKW.

As a threshold issue, courts assess the impacts of creating an interim change

that may itself be changed. *See, e.g.*, *Ctr. for Food Safety*, 56 F.4th at 663. Here,

closing the troll fishery would be an interim change. There is no indication that the

troll fishery would be closed indefinitely—in fact, NMFS has represented that it

will complete updated NEPA and ESA analyses by November 2024. 2-ER-0145–

46. As demonstrated above, closing the fishery for even just one year will have

dramatic cultural and economic impacts to the trollers. *See* 2-ER-0073–74. In stark

contrast, there is no indication that an interim closure will benefit SRKWs. WFC's

own expert concludes that closing the troll fishery would only help stabilize the

SRKW population at a 0.00 percent growth rate over the "long-term." 4-ER-0608–

09. That analysis suggests that the "long-term" is 100 years. 4-ER-0607. Thus, while the negative consequences will be severe, there is no indication that closing the SEAK troll fishery for one year would benefit the SRKW.

The link between the SEAK troll fishery and the health of the SRKW is tenuous, and remanding without vacatur would only impose the threat of speculative environmental harm. The district court overestimated the relationship between fishing in Southeast Alaska and the SRKW population, accepting without analysis WFC's contention that closing the fishery in Southeast Alaska would result in a meaningful increase in prey for SRKWs. *See* 1-ER-0038–39.

Critically, the majority of harvests in the SEAK troll fishery are not of those Chinook salmon stocks most preferred by the SRKW. As identified in the 2019 SEAK BiOp, the Chinook salmon most preferred by the SRKW amount to only two to three percent of the total catch for not just the winter and summer seasons of the SEAK troll fishery but all SEAK fisheries. 5-ER-1131. The origins of the fish caught in the SEAK fisheries are very well studied and understood, and the 2019 SEAK BiOp relied on that understanding when it concluded that, absent catch of stocks with relatively large run sizes, "the largest stocks contributing to the SEAK fisheries catch are currently not considered at the top of the priority prey list for SRKWs." *Id.* The 2019 SEAK BiOp notes that the greatest hypothetical reductions in prey to the SRKW from the SEAK fisheries "would likely occur rarely," would

be spread across a large area to limit "localized prey depletion," or would not align with the migratory pattern of the whales. 6-ER-1194.

These limited speculative impacts would be mitigated by the prey increase program. The tenuous relationship between the SEAK troll fishery and priority prey for the SRKW, coupled with the mitigation from the prey increase program, provided the justification for NMFS's no jeopardy conclusion in issuing the ITS. 6-ER-1195. Importantly, the mitigation from the prey increase program is not a one-to-one ratio with the harvests of the SEAK troll fishery because only a small amount of priority stocks for SRKWs are harvested in Southeast Alaska. The 2019 SEAK BiOp acknowledged that the target of the prey increase program was to mitigate effects much broader than those tied to the SEAK troll fishery. 5-ER-0888 (identifying that the targeted funding initiative was needed to mitigate the "effects of harvest and other limiting factors that contributed to the reduced status of Puget Sound Chinook salmon and SRKWs"). Thus, the mitigation from the 2019 SEAK BiOp was much more encompassing than just mitigating impacts from the SEAK troll fishery; it was intended to compensate for impacts from fisheries in Canada, states south of Alaska, and other limiting factors on the SRKW population. *Id.* In fact, the 2019 SEAK BiOp concluded that the proposed federal actions were intended to "improv[e] conditions for listed Chinook salmon and Southern Resident killer whales compared to recent years." 6-ER-1195.

As the district court held at the remedy stage, this mitigation is now "certain" and a "definite increase in prey is available to the SRKW from the prey increase program." 1-ER-0036. In other words, the "prey increase program is on track to provide the benefits to SRKWs that were anticipated in the 2019 SEAK BiOp." *Id.* (internal quotation marks and brackets omitted). If the prey increase program is maintained, there is little risk to SRKWs in allowing the SEAK troll fishery to operate. As a result, the equities demand remand without vacatur with respect to these specific circumstances.

### 3. The District Court Abused Its Discretion in Concluding that the ITS Must Be Vacated While the Prey Increase Program Is Maintained.

The district court abused its discretion because its equitable decision to vacate was based on fact-finding and legal errors. The court's decision demonstrated a "clearly erroneous factual finding" as the court failed to properly account for the magnitude of the cultural, spiritual, and economic impacts of vacatur. *Kenney*, 458 F.3d at 1032. The court's reference to the impacts was cursory, restating the estimates of economic impacts and summarily concluding that although it did not take "such economic consequences lightly, they [did] not overcome the seriousness of NMFS's violations." 1-ER-0035.

The court seemingly reached this conclusion because it also committed legal error by distorting the *Allied-Signal* test. Specifically, the court reasoned that it was

required to "'tip' the scale in favor of protecting listed species in considering vacatur." 1-ER-0034 (quoting *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015)). The *Klamath-Siskiyou Wildlands Ctr.* decision relied on this Court's holding in *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987), which, in turn, relied on the United States Supreme Court opinion in *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 186 (1978). Both the *Sierra Club* and *Tennessee Valley Auth.* decisions concerned the standard for an injunction rather than the vacatur standard. *See Tennessee Valley Auth.*, 437 U.S. at 172; *Sierra Club*, 816 F.2d at 1378. In the injunction context, those decisions highlighted Congress's intent of relying on "institutionalized caution" in favor of endangered species, particularly because "projects that jeopardize[] the continued existence of endangered species threaten[] incalculable harm." *Sierra Club*, 816 F.2d at 1383; *see also Tennessee Valley Auth.*, 437 U.S. at 186-94.

It is essential to note that the *Sierra Club* and *Tennessee Valley Auth.* decisions involved threats of drastic harm to the species from the challenged actions. In *Sierra Club*, unlike here, the agency had failed to secure the promised mitigation for its actions that were planned to occur in wetlands that were "essential to the survival" of two listed birds, thereby threatening jeopardy to the continued existence of the species. 816 F.2d at 1378-79, 1386-88. In *Tennessee*

*Valley Auth.*, the issue presented was whether to enjoin the completion of a dam when completing the dam would eradicate an entire endangered species. 437 U.S. at 173-74. As those two decisions demonstrate, caution in favor of the species is informed by the threats facing the species from the proposed actions at issue.

When considering vacatur, courts are obligated to conduct a "balancing test" and "weigh" the disruptive consequences against the agency's errors. *Ctr. For Food Safety*, 56 F.4th at 663. To the extent that caution in favor of listed species is appropriate in the vacatur analysis, it cannot supplant that obligation or tip the analysis so far as to effectively require vacatur, particularly when the threats to the species from the challenged actions are speculative.

In this matter, the district court abused its discretion in vacating the ITS after tipping its analysis in favor for the species without adequately balancing the equities of the speculative threat of harm to the species against the extreme and lasting disruptive consequences of vacatur. As demonstrated by the available evidence and the above analysis, there is a likelihood that vacatur will be short-lived and NMFS will substantiate the ITS on remand. Allowing the ITS to remain in place does not present a viable threat of jeopardizing the continued existence of the SRKW. The SEAK troll fishery's impacts to the SRKW are limited due to the stocks of Chinook salmon harvested by the fishery and the timing of any potential prey reduction. *See* 5-ER-1131. And, any such impacts will be compensated by the

41

mitigation provided for in the 2019 SEAK BiOp via the prey increase program—mitigation that was intended to compensate for much more than the impacts of the troll fishery and that the district court determined to be certain and providing the intended benefits. *See* 5-ER-0888 (broad intended benefits of mitigation); 1-ER-0036 (finding that the mitigation is providing the intended benefits). Any environmental harm to the SRKW from remand without vacatur is merely speculation. That speculation is dramatically outweighed by the certain cultural and economic harm that will befall the communities of Southeast Alaska and sound the "final death knell on their way of life." 3-ER-0525.

The district court exercised its discretion "to an end not justified by the evidence." *Morales*, 438 F.3d at 930. Any caution or tipping in favor of the SRKW is not sufficient to overcome the dramatic and certain spiritual, cultural, and economic harms that will result from vacatur, and "equity demands" remand without vacatur. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992.

## B. The District Court Abused Its Discretion in Striking Portions or the Entirety of Two Declarations Submitted by the ATA in Its Briefing on the Remedy.

In addition to reaching the wrong conclusion on vacatur, the district court abused its discretion in refusing to consider expert testimony offered by the ATA to inform the court's vacatur analysis. The district court held that neither Mr. Olson

nor Mr. Fujioka were sufficiently qualified to offer their opinions. In doing so, the district court applied the FRE 702 standard too strictly.

"The admission of expert testimony is governed by Federal Rule of Evidence 702." *FTC. v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014). Under FRE 702, a court "must ensure that all admitted expert testimony is both relevant and reliable." *Wendell*, 858 F.3d at 1232. An expert witness must also be qualified with "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." FRE 702(a). When considering admissibility of testimony in a bench trial, courts "are mindful that there is less danger that a court will be unduly impressed by the expert's testimony or opinion" than a jury. *BurnLounge Inc.*, 753 F.3d at 888 (internal quotation marks omitted). An expert need not be "formally qualified as [an] expert" because "in considering the admissibility of testimony based on some 'other specialized knowledge,' [FRE] 702 generally is construed liberally." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). The FRE 702 standard is "flexible" and the rule "should be applied with a liberal thrust favoring admission." *Wendell*, 858 F.3d at 1232 (internal quotation marks omitted).

Although FRE 702 favors admission of evidence, it still provides the fact finder with the discretion to determine the appropriate weight to afford the evidence. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir.

2014) ("[W]hen an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony."); *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) ("Disputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." (Internal quotation marks and brackets omitted.)).

### 1. Paul Olson Has Sufficient Specialized Knowledge to Opine on the Economic Consequences of Closing the SEAK Troll Fishery.

Under the flexible FRE 702 standard, Paul Olson possesses sufficient specialized knowledge to opine on the economics at issue in this matter. The district court acknowledged that Mr. Olson is an ATA member, a commercial salmon troller, and an attorney. 1-ER-0027. The court questioned Mr. Olson's characterization that he has "extensive familiarity with natural resource economics, including economic impact analyses." *Id.* (quoting 3-ER-0530). The court appeared to have discounted any specialized knowledge that Mr. Olson could have, noting that "for most of his 27 years of commercial trolling, between 40 to 70 percent of his income [has been] dependent on fishing." 1-ER-0027. As

Mr. Olson demonstrated, he has specialized knowledge on the economics of this matter and is not merely just a fisherman.

Mr. Olson explained that a primary aspect of his work in the last four years has "involve[d] the valuation of ecosystem services in Southeast Alaska and doing research and writing related to how those services influence the local, regional, and national economy." 3-ER-0530. Specifically, during that time, Mr. Olson has "review[ed] and collect[ed] socio-economic data related to Southeast Alaska's resources and fisheries on an annual basis" to help the Alaska Sustainable Fisheries Trust publish an annual report called "Sea Bank." *Id.* This report "quantifies the value of Southeast Alaska's fisheries and visitor economies to coastal communities." *Id.*

The declaration at issue is Mr. Olson's third declaration that was filed before the district court. In his first declaration, Mr. Olson highlighted the same economic experience related to the Sea Bank reports. 8-ER-1808. In that first declaration, Mr. Olson introduced a recent economic impact study on the impacts of reductions in harvest of Chinook salmon under the 2019 PST. 8-ER-1809–10. Mr. Olson also opined on multiple economic issues, including average ex-vessel income, the relative size of the commercial fishing sector in the Southeast Alaskan economy, and the multiplier effect of jobs and wages generated by the troll fishery in his first declaration. 8-ER-1808–10. Mr. Olson presented similar

45

opinions in his second declaration. 8-ER-1769–71. WFC did not move to strike either of those prior declarations and the district court considered Mr. Olson's prior economic opinions.

In his third declaration, Mr. Olson relied on his specialized knowledge of the economic issues in Southeast Alaska to highlight the inaccuracies that resulted from WFC's expert applying a "proxy model"—designed for California, Oregon, and Washington fisheries—to Southeast Alaska. 3-ER-0531, 0533. Mr. Olson highlighted inconsistencies between the analysis of WFC's expert and the economic study that Mr. Olson presented with his first declaration. 3-ER-0532–33. Mr. Olson also observed that WFC's expert had underestimated the ex-vessel value of the SEAK fisheries. 3-ER-0531. Mr. Olson presented additional economic analyses specific to the communities of Southeast Alaska that contradicted the findings of WFC's expert. 3-ER-0532, 0534–35. Mr. Olson's opinions—based on specialized knowledge regarding the economies of communities in Southeast Alaska—were particularly valuable to the district court because WFC's expert demonstrated "no experience relative to Alaska fisheries or economies." 3-ER-0535. While WFC failed to appreciate the true impacts to Southeast Alaska, Mr. Olson relied on his specialized knowledge to explain that closing the summer and winter seasons of the troll fishery would

cause many trollers to cease fishing immediately and risk the second-largest fishery in the region. 3-ER-0541.

The district court's decision to strike Mr. Olson's third declaration is not consistent with the relaxed FRE 702 standard, particularly given that the opinions were not presented to a jury. FRE 702 "contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and emphasis omitted). The fact that Mr. Olson has primarily earned his income from fishing does not preclude him from being qualified, as the district court suggested. 1-ER-0027. The court's conclusion that Mr. Olson failed to provide a minimal foundation to support his qualifications is particularly troubling considering that the court previously considered Mr. Olson's economic opinions in his first two declarations. Arguably, the court—at least implicitly—had already acknowledged that he had satisfied the threshold established by FRE 702 by allowing him to submit economic opinions prior to the declaration that the court struck. The court, as the fact finder, should have determined what weight to afford Mr. Olson's related opinions in his third declaration rather than strike the declaration.

**2.      Tad Fujioka Has Sufficient Specialized Knowledge to Opine on the Failure of WFC's Experts to Appreciate the Dynamics of Management of Fisheries Under the PST.**

The district court similarly applied the FRE 702 standard too narrowly regarding the declaration of ATA member Tad Fujioka. The court concluded that Mr. Fujioka did not identify any "specialized experience in data analysis that would qualify him to provide an expert opinion on impacts to the fisheries from closure or to rebut [the] population viability analysis" of WFC's expert. 1-ER-0028.

Mr. Fujioka demonstrated sufficient specialized knowledge on fisheries management, the PST, and fisheries impacts to support his declaration explaining how the analysis by WFC's expert was oversimplified and inconsistent with the PST. He explained that he was on the Board of the ATA between 2013 and 2021, including a stint as its vice president. 3-ER-0561. Mr. Fujioka also serves on the Board of Directors of the Seafood Producers Cooperative, having become chairman in 2021. *Id.* Both positions have provided Mr. Fujioka with specialized knowledge of the impacts of reduction in harvest levels for fisheries. 3-ER-0561–62. Perhaps most prominently, Mr. Fujioka also participates in the management of Alaska's fisheries as a member and past chairman of the Sitka Fish and Game Advisory Committee. 3-ER-0563. Mr. Fujioka's involvement with that committee involves "provid[ing] advice to the

Alaska Board of Fisheries on harvest, management, and allocation of Alaska's fishery resources." *Id.* Mr. Fujioka's responsibilities with that committee require him "to regularly review sales and marketing data, Alaska Department of Fish and Game management reports and research, and other materials related to the value, ecology, and harvest of Chinook salmon." *Id.* As evidenced by Mr. Fujioka's declaration, this experience has provided him with specialized knowledge in the practical application of the PST. *See, e.g.*, 3-ER-0562–70.

Mr. Fujioka did not rely on this specialized knowledge to submit his own population viability analysis. He merely used his knowledge and experience to demonstrate that the theoretical analysis conducted by WFC's expert was inconsistent with observed harvests and practical application of the PST. *See* 3-ER-0567–71. As discussed with respect to Mr. Olson, the court was free to weigh the competing opinions as it saw fit as the fact finder, but excluding the testimony was improper under the relaxed standard of FRE 702.

## VIII.    CONCLUSION

The SEAK troll fishery is at an unfortunate tipping point. A ruling on this dispute in favor of maintaining the ITS is critical. The district court's ruling and WFC's policy preferences will not completely change the course of the PST. NMFS will provide future incidental take statements for SEAK fisheries to harvest Chinook salmon. A proper recognition of the equities presented will help

dissuade a future cycle of biological opinions, incidental take statements, challenges to those statements, threats to the way of life of the trollers, and the need to obtain emergency relief. The ATA respectfully requests that the Court reverse the district court's decision with instruction to remand the 2019 SEAK BiOp without vacating the ITS or prey increase program while NMFS corrects its errors.

RESPECTFULLY SUBMITTED this 29th day of September, 2023.

*s/ Douglas J. Steding*
Douglas J. Steding, WSBA #37020
Greg A. Hibbard, WSBA #60526
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564
dsteding@nwresourcelaw.com
ghibbard@nwresourcelaw.com

*Attorneys for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers Association*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 29th day of September, 2023.

*s/ Eliza Hinkes*
Eliza Hinkes
Paralegal

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35322, 23-35323, 23-35324, 23-35354

I am the attorney or self-represented party.

**This brief contains** | 11,208 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [＿＿＿＿＿].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Douglas J. Steding | **Date** | 9/29/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                         *Rev. 12/01/22*